Filed 4/3/13  In re Viola B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re VIOLA B., Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.G.,<br><br>Defendant and Appellant. | F065202<br><br>(Super. Ct. No. JD125374)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Louie L. Vega, Judge.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, and Jennifer E. Feige, Deputy, for Plaintiff and Respondent.

-ooOoo-

A. G. (mother) appeals the disposition order removing the minor, Viola B., from her custody under Welfare and Institutions Code section 361, subdivision (c)(1),[1] and denying reunification services under section 361.5, subdivision (b)(2). After concluding the disposition order is supported by substantial evidence and it was not an abuse of discretion to deny reunification services, we affirm the disposition order.

### *FACTUAL AND PROCEDURAL BACKGROUND*

The minor, who was born prematurely in June 2006, has spent a large part of her young life hospitalized due to complex medical conditions, including cardiofacial-cutaneous syndrome,[2] chronic respiratory failure, seizure disorder, chronic lung disease, mental retardation, cerebral palsy, and gastroesophageal reflux disease. She depends on a tracheostomy and ventilator to breathe and a gastrostomy tube (G-tube) to receive nutrition. Sadly, the minor's genetic condition is non-recoverable; children with her condition generally die young from respiratory infection or organ failure.

In November 2010, the Kern County Department of Human Services (the department) took the minor into protective custody. At the time, the minor was hospitalized at Children's Hospital Los Angeles (CHLA). Hospital staff reported that the minor's parents, mother and Jimmy B. (father), were interfering with the minor's medical care, including by loosening her tracheostomy ties (trach ties), which can be life threatening. After she was discharged from CHLA, the minor was placed at All Saints

---

**1** All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

**2** The record contains the following definition of this condition: "Cardiofacial-Cutaneous (CFC) syndrome is a rare genetic condition that typically affects the heart (cardio-), facial features (facio-) and skin (cutaneous). It is seen in equal frequency in males and females and across all ethnic groups. Children with CFC syndrome may have certain features that suggest the diagnosis, such as relatively large head size, down-slanting eyes, sparse eyebrows, curly hair, areas of thickened or scaly skin, and small stature. Most will also have a heart defect."

Subacute Facility (All Saints) in Los Angeles and has resided there ever since. When necessary, she is transferred to CHLA for treatment.

The minor's parents are both developmentally disabled. They have been diagnosed with mild mental retardation and are considered high functioning. Mother also has epilepsy and Sturge-Weber Syndrome.[3] Father has a severe speech impediment. The parents reside together in Bakersfield and visit the minor in Los Angeles on a regular basis.

Although the parents have demonstrated deep love and concern for the minor and have been able to care for her at home for brief periods of time, they have a long history of being uncooperative with medical care providers and resistant to following instructions on how to provide adequate medical care for the minor. According to Susan McArthur, a public health nurse who has worked with the family for an extended period of time, the parents do not hesitate to take the minor to the hospital when necessary. But once the minor is admitted, conflicts occur between the parents and hospital personnel. The parents will not cooperate with medical professionals at the minor's bedside, nor will they take instruction from the physicians dictating her plan of care. The parents are "adamant that they are the only ones who can really provide care for [the minor]."

The parents' behavior has resulted in a number of medical care providers declining to work with the family, including Children's Hospital of Central California (CHCC), where the minor has spent substantial amounts of time since birth. CHCC has a special clinic for children with complex medical problems like the minor. However, the minor

---

[3] The record contains the following definition of the syndrome: "Sturge-Weber Syndrome (encephalotrigeminal angiomatosis) is a congenital, non-familiar disorder of unknown incidence and cause. It is characterized by a congenital facial birthmark and neurological abnormalities. Other symptoms associated with Sturge-Weber can include eye and internal organ irregularities. Each case of Sturge-Weber Syndrome is unique and exhibits the characterizing findings to varying degrees."

will no longer be admitted to CHCC as a patient except on an emergency basis. Dr. Horsepool, a CHCC doctor, reported that treating the minor entailed a "constant battle" with the parents, who would do things their own way despite medical orders. Dr. Horsepool noted the parents were inflexible in their thinking and had difficulty following "changing directions." They also had a "false belief" the minor would get better. Dr. Horsepool believed a subacute facility was the best placement for the minor. Based on his experience with the parents, he predicted that, if the minor were returned home, the parents would continue to bring the minor to the hospital over and over again and, when she eventually died, would blame whoever was caring for her at the time.

Another health care provider that will no longer work with the parents is Maxim Healthcare Services (Maxim), an agency in Bakersfield which provided in-home nursing services to the minor between December 2006 and May 2007. Kathleen Schoen, Maxim's director of nursing, reported that the parents did not appear to understand the extent of the minor's medical problems but seemed to have "a stero[]typical view of baby care." The parents would disregard specific instructions from the minor's primary physician, including not to take the minor out in wet and cold weather due to her severe respiratory problems. In addition, although the minor was prone to fevers, the parents would set their thermostat at 75 to 80 degrees and bundle the minor in blankets and put her in bed with them underneath their sheets and blankets. When the night nursing staff would take her out of bed to cool off, "sure enough [the minor] would be running a fever." The parents would become very upset at the nursing staff about this and did not seem to understand that their actions were causing the minor to have a fever.

Schoen reported that Maxim finally discharged the family after a number of incidents in which father lost his temper and made threatening movements towards nursing staff. Schoen confirmed that her agency was no longer willing to serve the family. However, they might consider it if father "was out of the home and not in the

4

picture at all." According to Schoen, although there were other nursing agencies in Kern County, Maxim was the only agency that provided in-home pediatric nursing.

On November 4, 2010, the department filed a dependency petition on the minor's behalf, alleging the minor had suffered, or there was a substantial risk she would suffer, serious physical harm or illness as a result of her parents' willful or negligent failure to provide her with adequate medical treatment, and the parents' inability to provide regular care for her due to their developmental disabilities (§ 300, subd. (b)).

According to the allegations in the petition, the minor was hospitalized at CHLA in October 2010, where the medical staff instructed mother on the need for tightness of the minor's trach ties. Mother disregarded these instructions and loosened the minor's trach ties on four different occasions and argued with medical staff when they retightened the trach ties. On October 23, 2010, mother loosened the minor's trach ties to the point the tube fell out, resulting in a respiratory problem and decline in the minor's oxygen saturation. Because mother's interference with the minor's medical care could potentially result in her death, CHLA restricted mother to supervised visits. The petition further alleged that father "became volatile and assaultive towards the hospital social worker by 'blocking' her from leaving a room." Both parents also threatened to take the minor and leave against medical advice.

On November 5, 2010, the juvenile court ordered the minor detained and set a jurisdiction hearing. The parents were permitted supervised visits with the minor every other week for two hours. The jurisdiction hearing was continued several times. In the meantime, the department filed a detailed jurisdiction report, documenting the evidence supporting the allegations in the dependency petition, and two supplemental reports, documenting the parents' continuing lack of cooperation with medical staff.

On December 22, 2010, CHLA contacted the social worker and informed her that the minor needed surgery to revise her G-tube because it was leaking, but mother was

5

refusing to sign a consent form for the surgery. When the social worker followed up with a phone call to mother, mother stated she would not consent to surgery until she could see the minor. While they were talking, the social worker could hear father yelling in the background. Mother expressed the opinion that All Saints had "messed up" the G-tube and this was why the minor needed surgery. The social worker arranged for a supervised visit so that mother could sign the consent form.

After the surgery on December 23, 2010, Dr. Garcia, the minor's main doctor at CHLA, came in and told the parents the minor had done well and could be discharged to All Saints in a few days. The doctor also talked about why the surgery was done. The parents indicated they had no questions for the doctor at that time. However, after Dr. Garcia left the room, mother criticized what had been done and said a different type of tube should have been used. When the social worker asked mother why she did not talk to the doctor about it, mother said she did not want to get in trouble by arguing with the doctor.

After the minor was released from CHLA and transferred back to All Saints on January 3, 2011, mother refused to sign the admissions packet required by All Saints based on her belief that the facility had caused the minor to become ill and require surgery. The minor subsequently received additional treatments at CHLA. On January 21, 2011, All Saints contacted the social worker and reported that it now had four admissions packets the parents needed to sign, explaining the parents had to sign a new admissions packet every time the minor was released from the hospital.

On January 27, 2011, while the parents were attending a supervised visit with the minor, All Saints' vice president of operations informed the social worker that, unless the parents signed the admissions packets, the facility would be forced to discharge the minor that day. When the social worker and All Saints staff tried to explain the situation to the parents, the parents continued to refuse to sign the paperwork and started raising their

6

voices. The social worker then started calling the attorneys involved in the dependency proceeding to apprise them of the situation. The same day, an ex parte hearing was held and the juvenile court ordered the minor to remain at All Saints.

Prior to the jurisdiction hearing, the juvenile court ordered the parents to undergo a psychological evaluation by Dr. Allison Little to determine the necessity of appointing a guardian *ad litem* for each parent. At a hearing on March 16, 2011, the court determined each parent was in need of a guardian *ad litem* and made the necessary appointments.

Following the contested jurisdiction hearing on March 22, 2011, the juvenile court found all the counts and specific allegations in the dependency petition to be true. The court set a disposition hearing and reappointed Dr. Little to evaluate the parents on the question of whether they could benefit from reunification services. At the department's request, the juvenile court continued the disposition hearing again and appointed Dr. Eugene Couture to evaluate the parents.

After numerous continuances, the disposition hearing commenced over a year after the jurisdiction hearing. In the interim, the department filed seven reports. The original disposition report, prepared in late June 2011, recommended removing the minor from the parents' custody, adopting a permanent plan of long-term foster care, and continuing the minor's placement at All Saints. Based on the results of the two psychological evaluations, the report also recommended denying reunification services to the parents. Both Dr. Little and Dr. Couture concluded that the parents were incapable of utilizing reunification services due to the parents' developmental disabilities.

Dr. Little evaluated the parents on March 29, 2011. She reported that, while interviewing both parents, father would often raise his voice, stand up in a "threatening" manner, and argue about the case. Although his arguments were largely unintelligible due to his speech impediment, he clearly was angry and had difficulty controlling his

7

emotions. During these episodes, mother frequently told father to "be quiet," "shut up" and "sit down."

During the evaluation, Dr. Little asked mother if she would allow outside agencies to support her in the medical care of the minor. Mother said it would be okay, but she would not want them to help the whole day. When Dr. Little asked mother what she would do if she disagreed with recommendations from the minor's primary care physician and supportive medical staff, mother responded:

> "I know about my baby. They expected her to live only two years, but I got her to live four years. But now she's fighting for her life in Los Angeles. I think she's not happy with all this stuff that's going on. They can't take care of her. Probably not giving her the right medicine. They should already know the medicines. She's dying slowly down there. It's different down there. It was better before. She's always asleep now to keep her calm. They can't keep her calm when she's awake."

When Dr. Little attempted to pursue her last question further, mother "became somewhat defensive and was unable or unwilling to discuss the issue further."

Dr. Little reported that mother obtained an IQ score of 69, which fell in the range of mild mental retardation. When asked about psychotic symptoms, mother described seeing and hearing ghosts at the hospital. Mother's records also indicated that she sometimes presented as suspicious to paranoid regarding others' intentions. Based on these factors, Dr. Little could not rule out a possible diagnosis of psychotic disorder, not otherwise specified. However, she did not have enough information to offer the diagnosis with certainty.

Dr. Little concluded the parents were incapable of utilizing reunification services based on their developmental disabilities, as well as their failure to understand and cooperate with medical staff recommendations in the minor's best interests. Dr. Little observed:

8

"[The parents] have been afforded numerous educational opportunities in order to participate in the medical care of the minor. However, even with this education the parents continue to disregard medical staff recommendations, treatment plans, and pursue their own beliefs regarding the needed medical care of the minor, potentially endangering their daughter's life. These episodes have not thwarted the opinion that they know best, even to the point that the mother has engaged in behaviors that placed the minor at threat of death, as well as both parents threatening to take the minor out of the hospital against medical advice. Based on the parents' interactions with supportive staff in both the hospital setting as well as in-home supports, their behavior ha[s] led to agencies refusing to provide medical attention to the minor."

A similar conclusion was reached by Dr. Couture, who evaluated the parents on May 23, 2011. He observed the parents were "clearly functioning in the range consistent with Mild Mental Retardation." He described mother as "very suspicious and very perseverative" and explained "[p]erseverative behaviors are those behaviors which are repetitive, where the individual is not able to learn from feedback." Dr. Couture noted that mother "does seem to get stuck on issues and has a great deal of difficulty in changing," indicating "she is not able to use outside information to make adequate, independent decisions."

Based on his review of the records, Dr. Couture observed that, when the minor "was younger and somewhat less involved," the parents were able to learn some of the skills necessary to maintain the minor in their home and provide care that was "adequate for her complex medical situation." However, Dr. Couture concluded,

"I think the physicians, in this case, have come to the correct conclusion that the parents simply do not have the cognitive ability to understand what their daughter needs and when she needs it …. It is not acceptable to argue with the nursing staff. It is not acceptable to refuse services because you are suspicious. They must cooperate with the process of medical care and medical administration in order for their daughter's care to be complete. I think, given their overall situation, they present an unacceptable level of risk to [the minor].

9

"This is a sad situation. It is my opinion that these parents could be good parents for a child without all of these extreme medical demands presented by [the minor]. However, in this situation, the demands are simply too high for them to cope. They have had repeated opportunities to learn to do better and they have not done so. It is, therefore, my opinion that they are mentally retarded and that this mental disability renders both parents incapable of utilizing family reunification services in this case."

During the year leading up to the disposition hearing, the parents complied with their initial case plans by completing parenting and neglect classes. After initially resisting, father also enrolled in and completed a recommended anger management program.

Supplemental reports filed near the time of the disposition hearing reflected that mother continued to express disagreement with the opinions of medical professionals regarding the minor's care and father continued to have angry outbursts.

During a supervised visit on February 9, 2012, the minor had three seizures, but mother did not believe the first two were seizures despite being so informed by the nurse. The social worker observed that, during the first seizure, the minor's body began to stiffen, she turned red to the point of almost looking purple, and her eyes moved rapidly. The nurse administered medication rectally at five minutes. Within a few minutes, the minor began to loosen up and her color began to look better. Mother whispered to the social worker that it was not a seizure but a "breathing fit." When the social worker pointed out that the nurse had called it a seizure, mother repeated it was not a seizure and said that giving the minor medicine would make her become immune to it as it was not a seizure. The nurse then informed mother that the doctor had called it a seizure. The social worker told mother that if the doctor called it a seizure, it was a seizure. Mother whispered to the social worker that the minor also had "tantrums" and they looked just like seizures.

A little while later during the same visit, the minor had a second seizure. No medicine was administered because the seizure did not last long. Mother told the social

10

worker that the minor had a "tantrum" not a seizure. Approximately 15 minutes later, the minor stiffened up, became red, and her eyes started moving rapidly. This time, mother said the minor was having a seizure and the social worker called the nurse. The social worker pointed out to mother that the minor did the same thing all three times. Mother replied that she could tell the difference between a "tantrum," a "breathing fit," and a seizure.

On March 22, 2012, All Saints informed the social worker that the minor was having difficulty breathing and was being transferred to CHLA that day. On March 29, 2012, the social worker informed the parents that the minor needed surgery to replace her G-tube with a gastrojejunostomy tube (J-tube or GJ-tube). The parents were unwilling to consent to the surgery and mother expressed the belief that removal of the G-tube would kill the minor. When the social worker asked mother where she got that information, mother stated that one of the hospitals had told her, but she could not remember which one.

On March 30, 2012, Edward Rivera, a CHLA social worker, spoke with the parents regarding the medical team's surgical recommendation to change the minor's G-tube to a GJ-tube. Rivera reported that after he explained the procedure, the pros and cons, and that it would benefit the minor, mother was unable to reiterate what he had told her.

On April 2, 2012, mother called the department social worker and asked if she could skip the next scheduled visit with the minor, who was then hospitalized at CHLA. Mother explained she did not want to be there because she had an argument with the CHLA social worker. The department social worker encouraged mother to visit the minor and said she would call the hospital and request that only she and the parents be present during the visit. Mother stated she objected to the surgery and wanted to help the minor by not making her go through another surgery. Mother explained she had been

11

told that the minor's current G-tube would last a long time, and she felt that the hospital wanted to argue with her. The social worker told mother the doctors were just trying to explain why the surgery was needed. Mother replied that it was not needed and she did not want to argue.

On April 5, 2012, the social worker met with the parents and Dr. Elizabeth LaGuardia, one of the pulmonologists who had been treating the minor at CHLA. The social worker told Dr. LaGuardia that the parents were now willing to sign the consent forms for the GJ-tube surgery. When the doctor asked whether the parents had any questions, mother hesitated and then said, "not really." The social worker told Dr. LaGuardia that mother had voiced concerns and that another hospital had told her that removal of the G-tube would hurt the minor. Dr. LaGuardia explained to the parents that, during the procedure, they would use the same area but would put a tube a little farther in the stomach into the beginning of the intestine to help the minor with reflux, aspiration, and lung infections. Although there were risks with any surgery, the procedure could help improve the minor's health and lead to fewer illnesses.

After Dr. La Guardia explained the surgery, mother said her attorney advised her to sign the consent form or else it would look bad on the parents and the minor would not be returned to them. The social worker asked mother if she would consent to the surgery even if the minor was not in protective custody. Mother said that she would. When asked if she understood what the surgery was for, mother said she did but was concerned.

During the parents' conversation with the social worker on April 5, 2012, father became upset and complained about his attorney. Father said that if the minor was not returned to them at court, he was going to "hit the social workers" and "attorneys." Because of his speech impediment it was difficult to understand what he was saying, but the social worker heard him say something with the word "dead" in it. While father was making these statements, mother told him to "shut up."

12

Father became agitated again during a supervised visit at All Saints on April 19, 2012. When the parents arrived, mother became very concerned and informed the staff she was scared because the minor was turning blue. They came in to check on the minor but could not find anything wrong. Father began to get upset and yelled, "you are not doing anything for my baby. She is dying and turning blue." Mother asked the staff to suction the minor's trach and they did. When a staff member went to throw the mucous away, father grabbed it and placed it in his pocket. The staff member pulled the social worker aside and said he was afraid father was going to hit him because father had thrown chairs in the past.

The parents were then taken into a separate room to meet with several representatives of All Saints, including the vice president of operations. The vice president of operations told the parents their behavior was unacceptable and, if they acted out again, the facility would seek a restraining order to prevent them from visiting the minor. After the meeting, the rest of the visit went better. The parents calmed down and were compliant. However, the vice president of operations told the social worker that she was concerned about the possibility the minor would be returned to the parents. Based on her observations, she did not feel the parents had the ability to maintain a quality level of care for the minor.

After conducting updated psychological evaluations of the parents on April 24, 2012, Dr. Little reported that it continued to be her professional opinion that the parents were unable to utilize reunification services. Dr. Little noted that "even with education offered by the medical treatment team, the mother has continued to demonstrate her own opinion as it relates to the medical best interest of her daughter." Dr. Little observed that the parents continued to express the belief that the surgery to replace the minor's G-tube was not necessary, although they had consented on the advice of their attorney. Dr. Little also cited the incident where mother persisted in the belief that the minor was not having

13

seizures despite medical advice to the contrary. Dr. Little opined "[t]his incident reflects mother's inability to recognize the severity of their daughter's fragile health and symptoms associated with her medical diagnoses." Dr. Little concluded that "once again it is my opinion that the mother and [father] are incapable of utilizing reunification services at this time based upon their developmental disability, as well as failure to understand and cooperate with medical staff recommendations in the best interest of their minor daughter."

The contested disposition hearing finally commenced on May 30, 2012. After the court heard testimony on May 30, there was another delay and the hearing finally resumed on June 20 and concluded on June 22, 2012.

On the first day of the hearing, a letter prepared by Dr. LaGuardia was introduced and the parties stipulated it would be admitted in lieu of testimony. The letter presented a brief overview of the minimum requirements to care for the minor at home, including, among others things, a "[h]ome skilled nursing agency with experience/ability to care for pediatric patients on home mechanical ventilation (24 hours/day of home skilled nursing care is recommended)."

Mother also called Dr. Christine Deeths as an expert witness. Dr. Deeths, a family medical doctor in Bakersfield, testified she had experience working with children with severe medical issues and helped coordinate their care with multiple specialists. Dr. Deeths examined the minor at All Saints and opined the minor could be maintained at home if all the proper services were put into place. The doctor also met with the parents and talked to them about the minor's condition. She found they both understood the minor's condition and were able to articulate "knowledge of the fundamental care to maintain the child's needs to survive, the ventilator, the tracheostomy and the G-tube."

Dr. Deeths testified that the minor's medical records reflected that the minor, who was then almost six years old, had originally been expected to live only between two and

14

two and a half years of age. The records also reflected that, on more than one occasion, the parents had successfully completed training at CHCC and had been able to care for the minor for periods of 24 to 48 hours without any concerns. According to Dr. Deeths, the protocols the parents had to meet for the minor to be discharged from CHCC were the same as the requirements set forth in Dr. LaGuardia's letter.

Dr. Deeths testified she was familiar with the resources available in Bakersfield and opined that there was nothing being done for the minor at All Saints that could not be done for her locally. Dr. Deeths also described some of the negative impressions she had formed of All Saints during the 20 to 30 minutes she spent with the minor. She also testified generally about the benefits of living in a home setting versus a hospital setting.

Dr. Deeths was later recalled and testified that, based on a conversation she had with Dr. LaGuardia, she did not interpret Dr. LaGuardia's letter to mean that "there needs to be a nurse in the home 24 hours a day, seven days a week." Rather, Dr. Deeths understood it "to mean that there needs to be an availability of a nurse by telephone in the event of a problem or emergency 24 hours a day."

Dr. Deeths acknowledged that in Bakersfield, Maxim was the only company that provided in-home skilled nursing to pediatric patients, but she believed there were other ways that need could be met, including using a nursing agency from another city or utilizing the services of private nurses. The minor might also be eligible for home hospice care, as new legislation had recently been passed allowing pediatric patients already on home ventilators to continue to use ventilators even when under hospice care.

Mother also called a number of witnesses who provided positive testimony regarding the parents' ability to care for the minor at home. Carolyn Tellanian, a clinical social worker at CHCC, testified that she had known the parents for approximately three years and thought they "did an exceptional job" caring for the minor. Tellanian explained that, before the parents were allowed to take the minor home from the hospital,

they each had to provide 48-hour care for the minor with the nurses standing by to provide help if needed. When the nurses and respiratory therapist signed off to allow the parents to take the minor home, it meant they were very confident with the parents' care of the minor.

Tellanian confirmed that currently the minor could only be admitted to CHCC in the case of an emergency and could not be a regular patient at the clinic. Although father tended to raise his voice when he was excited and had made the nurses uncomfortable, Tellanian never thought he was a physical threat to anyone. She observed the parents were very attentive and affectionate towards the minor. It never appeared to her that their disabilities prevented them from learning how to care for her. Rather, Tellanian thought the parents "learned everything … exceptionally well." Father had an "impressive" understanding of the medical equipment and the parents "worked as a team very well."

Danny Lack, a respiratory therapist, testified he worked for a company that provided ventilators for in-home use. His primary responsibilities included training families on how to care for patients and manage their equipment. When Lack met the parents in November 2011, they were able to articulate most of the settings on a ventilator they had used with the minor a year earlier. He was "surprised by the amount of information that they retained." Despite the parents' developmental disabilities, Lack felt he would be able to train them how to use the two types of ventilators currently used in home-care settings.

During his meeting with the parents, Lack brought trach ties and a tube similar to the ones they would use on the minor and asked them to place them on one another. The parents demonstrated they could properly attach the trach ties. Lack also brought in a ventilator and showed the parents how to use it. After speaking about other topics for a while, Lack asked the parents to demonstrate what he had taught them about the ventilator. The parents retained the information and repeated it to him.

16

On cross-examination, Lack testified that his agency did not provide in-home nursing, but he had worked with three pediatric in-home agencies in Bakersfield, including Maxim, Around the Clock, and Interim.

Mother also called Dr. Little, who confirmed that it was not her opinion "the parents were incapable of learning anything." However, Dr. Little testified, "I feel like collectively, with their development disability, their unwillingness at times to follow medical directives, their behaviors together make them, in my opinion, not able to utilize family reunification services at this time." Dr. Little observed that despite completing the components of their case plans, the parents' behavior since was such that it was still her opinion they were not capable of benefiting from reunification services. Although she thought the parents could participate in and benefit from classes, it appeared they were unwilling to change their behavior.

In her testimony, department social worker, Dina Tucker, acknowledged that, although mother was argumentative with medical staff, she had not done anything to interfere with the medical equipment or treatment of the minor for the past year and a half. Mother was also capable of putting the trach tube back in and was actually the one who put it back in on the occasion at issue when it fell out because mother loosened the trach ties.

Tucker further testified that the parents had consistently visited the minor until recently. The parents' explanation for why they had not attended recent visits with the minor was that there were always concerns at the visits and they did not want to argue with the staff and upset the minor.

Tucker was concerned the parents were not going to be able to get the supportive services they needed based upon their history of noncompliance with doctors and nursing agencies. When she researched providers of in-home nursing services, the only two providers she found were Maxim and Interim; Around the Clock did not come up.

17

Interim did not provide pediatric nursing services and Maxim was not willing to take the minor unless the father was out of the house. The department was unable to locate a subacute facility in Kern County where the minor could be closer to the parents. Although there was one in Delano, it was not available.

Department social worker, Colleen Saenz, testified that the parents had been offered a choice to visit the minor once a week for an hour, or every other week for two hours. They chose the latter because it was too expensive to drive down to Los Angeles every week. Without traffic, the trip took about an hour and 40 minutes. During visits, the parents showed appropriate concern towards the minor and were affectionate with her.

When the parents were not at All Saints, someone spent a minimum of two to three hours with the minor each day. There was a teacher who came in and did things like talk and sing to her. Someone also picked her up each day. Saenz never observed the minor react differently to the parents than to anyone else. The minor had a positive response to touch and both the parents and the nurses were able to calm her down by rubbing her hair.

Saenz, who was present during the incident when mother expressed the opinion that the minor was not having seizures, confirmed that mother did not try to interfere with what the medical staff was doing but just whispered her opinions in the social worker's ear.

With respect to the parents' initial resistance to surgery to replace the minor's G-tube with a GJ-tube, Saenz testified that they expressed a legitimate concern based on their report of a previous experience in which the minor had an infection following a surgery. Saenz's understanding was that the new surgery would help the minor from getting ill so often. Because of the minor's chronic lung disease, she was always having infections and the placement of a GJ-tube would alleviate some of the mucous and

18

aspirations that were getting down into her lungs. Saenz testified the parents remained "on the fence" about the surgery but consented after being advised to do so by mother's attorney.

Saenz further testified she had investigated other out-of-home care options for the minor, including the possibility of placing her with a foster family living closer to the parents. However, the fee for a foster family was between $6,000 and $9,000 per month, which was not covered under Medi-Cal or Social Security, and the parents said they could not afford that. Other than the unavailable facility in Delano, there was a subacute facility in Lancaster, but Saenz had heard from people at CHLA and All Saints that it was not a good facility.

Mother and the minor's maternal grandfather also presented testimony describing positively the care routines the parents followed in the past when caring for the minor at home, as well as their appropriate responses in emergency situations.

After listening to the arguments of counsel, the juvenile court ruled, in relevant part, as follows:

> "The two medical experts or psychological experts in this case, Doctors Little and Couture, have both concluded that the parents are not capable—or incapable of utilizing reunification services based on their developmental disability as well as their failure to understand and cooperate with medical staff recommendations in the best interests of their daughter. That's, in essence, what they have concluded.

> "The evidence presented to this court regarding this child's prognosis was that apparently at the outset, it was estimated—or the prognosis was that she might survive to two and a half years of age. And now a week and a day from today, she'll be turning six years old. So, certainly, those types of educated conclusions aren't always predictive. Certainly, they are what we have to rely on to the extent that they can be used for making plans.

> "What I've read in these reports and was testified to as well is that the parents' behavior at the children's hospital in Madera .… [] …was such that they could only utilize their services on an emergency basis.

19

Children's Hospital Los Angeles has similar concerns. A local provider of services ceased providing those services because of the behavior of at least one of the parents, [father]. And the indication from the testimony given by Mr. Lack was that [if father] were not in the home, his understanding was that they might provide those services.

"That is consistent with what the—what we've heard as far as—and reviewed as far as the evidence is concerned regarding these parents' ability to benefit from reunification services—or to be able to utilize those services is the better way of putting it.

"There is a schism between the parents and those they have to rely on for providing services for their child. Most recently, according to the mother's testimony, this has resulted in them not visiting this child. I can't say that the evidence from Doctors Little and Couture is not competent evidence, that the parents are unlikely to be able to adequately care for this child. I believe the parents should still be able to have an ongoing relationship with this child. But the court cannot agree with counsel's argument that family maintenance services should be provided and that reunification services should be extended .… [¶]

"I think there is clear and convincing evidence at this point that supports the recommendations that have been proffered by the Department of Human Services, and the court is going to follow those recommendations. [¶] … [¶]

"The court has read and considered the social worker's reports and supplemental reports …, as well as the other evidence presented during these past four hearing dates, and makes the following findings and orders based on that information: [¶] … [¶]

"There is clear and convincing evidence that there is a substantial danger to the physical health, safety, protection or physical or emotional well-being of the child or there would be if the physical custody of the child is not removed from the parents or guardians, and there are no reasonable means to protect the child's physical health without removal of the child from the physical custody of the parents .… [¶] … [¶]

"Family reunification services are not to be provided to the parents … as there is clear and convincing evidence the child comes within Section 361.5 subdivision (b)(2) of the Welfare & Institutions Code.

20

"The aforesaid are suffering a mental disability as described in Chapter 2 commencing with Section 2820 of Part 4, Division 12 of the Family Code which renders the aforesaid incapable of utilizing services and competent evidence from mental health professionals that establishes that even with services, aforesaid are unlikely to be capable of adequately caring for the child within twelve months."

## DISCUSSION

### I. Substantial evidence supports the disposition order.

A child may properly be removed from the physical custody of her parents if the court determines, based upon clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' … physical custody." (§ 361, subd. (c)(1).) However, even when the standard of proof below is clear and convincing, we cannot weigh the evidence on appeal. We must uphold the juvenile court's order if there is substantial evidence to support it. (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 170.)

The substantial evidence test is well known: "In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact." (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.)

Before addressing mother's sufficiency of the evidence challenge, we briefly address her claim that the juvenile court failed to state a factual basis for its section 361,

21

subdivision (c)(1) findings but instead "focused exclusively" on the department's recommendation to deny reunification services under 361.2, subdivision (b)(2), based on the psychological evaluations, which concluded the parents were unable to utilize reunification services. The record belies mother's claim. In addition to the psychological evaluations, the court specifically referred to testimony presented at the disposition hearing and information contained in the reports, which supported the court's finding of "a schism between the parents and those they have to rely on for providing services for their child" and the court's conclusion that "the parents are unlikely to be able to adequately care for this child."

Although the juvenile court did appear to rely heavily on the psychologists' evaluations in ordering the minor removed from mother's custody, this was not improper. The experts did not limit their opinions to the question of the parents' ability to utilize reunification services but also addressed the parents' ability to provide adequate care for the minor and cooperate with medical staff in the minor's best in the minor's best interests.

Mother's reliance on *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415 (*Tracy J.*) is misplaced. That case teaches that,

> "'Harm to the child cannot be presumed from the mere fact of [the developmental disability] of the parent .… The proper basis for a ruling is expert testimony giving *specific examples* of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety.' [Citation.]" (*Tracy J.*, *supra*, at p. 1424, italics added.)

Here, the psychologists submitted detailed reports with specific examples of how mother's past and current behaviors placed the minor's health and safety at risk. There is no indication either expert presumed harm to the minor based on the mere fact of mother's developmental disability or that the juvenile court ever adopted such a position.

We likewise see no support in the record for mother's claim that the court violated her equal protection rights by basing its removal order solely on her mild mental retardation instead of considering the relevant factors under section 361, subdivision (c)(1).

Focusing on the evidence favorable to her, mother argues the disposition order removing the minor from her custody is not supported by substantial evidence. She argues the minor could be properly protected if returned to the parents' home under court supervision. Her argument assumes she and father would be able to obtain all the services necessary to maintain the minor safely at home. She does not acknowledge the parents' history of being dropped by medical caregivers and facilities due to behaviors the parents continued to exhibit up to the time of the disposition hearing, including frequently disagreeing with the opinions of the doctors and nurses charged with the minor's care. Thus, even assuming the parents were able to find agencies willing to work with them, the record supports the inference that a conflict or schism between the parents and medical care providers would almost certainly arise again, jeopardizing the minor's health and safety.

Evidence of mother's persistence in expressing inaccurate and inflexible opinions regarding the minor's condition and medical needs indicates mother cannot presently be trusted to follow medical advice. Just a few months before the disposition hearing, mother stubbornly insisted that two seizures suffered by the minor were not seizures but merely "a breathing fit" and a "tantrum." Mother would not alter her opinion when confronted with the contrary opinion of the physician and the fact the minor's symptoms were identical to the ones the minor presented during an event mother acknowledged was a seizure. Mother also expressed a troubling belief that the medication the nurse administered to control the first seizure was unnecessary and would result in the minor becoming immune to it. Although mother testified at the disposition hearing that she

23

would have administered the medication to the minor if the event had occurred while she was caring for the minor at home, the record contains ample evidence from which the court could reasonably infer mother was simply saying what she thought the court wanted to hear and would follow her own beliefs if given the chance.

Based on the record before us, we agree with Dr. Couture's opinion that mother presents an "unacceptable level of risk" to the health and safety of the minor and conclude that substantial evidence supports the juvenile court's disposition order removing the minor from her care.

## II.     *The denial of reunification services was not an abuse of discretion.*

The juvenile court denied the parents reunification services pursuant to section 361.5, subdivision (b)(2), which provides:  "Reunification services need not be provided to a parent … when the court finds, by clear and convincing evidence .…  [¶] … [¶]  That the parent … is suffering from a mental disability … and that renders him or her incapable of utilizing those services."  We review the denial of reunification services for abuse of discretion.  (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

No abuse of discretion appears.  The original psychological evaluations and the updated evaluation conducted shortly before the disposition hearing consistently concluded that mother was suffering from a developmental disability and that her developmental disability rendered her incapable of utilizing reunification services.  Those conclusions were well founded.  As just discussed, throughout the proceedings, mother persisted in her beliefs about the minor's complex medical conditions, even when those beliefs conflicted with those of the experienced medical professionals caring for the minor.  Thus, mother continued to exhibit the perseverative behavior Dr. Couture originally observed, indicating her inability "to use outside information to make adequate, independent decisions."  Dr. Little's updated evaluation also observed that, despite mother's participation in parenting and neglect classes and efforts by medical

24

staff to educate her, mother "continued to demonstrate her own opinion as it relates to the medical best interest of her daughter." In support of her opinion, Dr. Little cited recent incidents, including the incident when mother insisted the minor was not having seizures despite medical advice to the contrary. The psychologist observed that this incident reflected "mother's inability to recognize the severity of their daughter's fragile health and symptoms associated with her medical diagnoses." Again, mother's reliance on *Tracy J.* is misplaced because the psychologists' opinions here were well supported with specific examples of behaviors demonstrating mother's inability to utilize reunification services. The court properly denied reunification services.

## ***DISPOSITION***

The disposition order is affirmed.


_____
HILL, P. J.

WE CONCUR:


_____
WISEMAN, J.


_____
PEÑA, J.