[No. D060252. Fourth Dist., Div. One. Jan. 26, 2012.]

TRACY J. et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Real Party in Interest.

---

## COUNSEL

Jamie A. Moran, under appointment by the Court of Appeal, for Petitioner Tracy J.

Valerie N. Lankford, under appointment by the Court of Appeal, for Petitioner Michelle B.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Real Party in Interest.

Christopher Blake, under appointment by the Court of Appeal, for Minor.

OPINION

McINTYRE, J.—Tracy J. and Michelle B. seek review of juvenile court orders terminating family reunification services and setting a hearing under Welfare and Institutions Code section 366.26. (Further statutory references are to the Welfare and Institutions Code.) They contend there is not substantial evidence to support the findings that it would be detrimental to return their son, T.J., to their physical care and that reasonable services were offered or provided to them.

We conclude that the parents, who are developmentally disabled, did not receive reasonable family reunification services. Despite positive reports from professionals about the parents' devotion to the child and to his safety, the San Diego County Health and Human Services Agency (the Agency) unreasonably limited visitation services. We emphasize that harm to a child cannot be presumed from the mere fact a parent is developmentally disabled. The Agency may not limit a developmentally disabled parent's visitation in the absence of evidence showing the parent's behavior has jeopardized or will jeopardize the child's safety, and it cannot impede the progression of visitation services to a parent solely out of concerns about the parent's mental health status. Accordingly, we grant the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Tracy J. and Michelle B. are the parents of T.J., born January 2010, and Nancy J., born May 2011. This proceeding concerns only T.J. (Nancy is mentioned when relevant to T.J.'s case.) Nine days after his birth, the Agency detained T.J. in protective custody and filed a petition alleging Michelle and Tracy were developmentally disabled and could not provide regular care to him. (§ 300, subd. (b).)

The juvenile court sustained the petition, removed T.J. from parental custody and ordered a plan of family reunification services. Michelle's and Tracy's case plans included general counseling, a parenting education program, psychological evaluation and a San Diego Regional Center (SDRC) assessment and services, if offered.

Michelle said she had Prader-Willi syndrome, a noninherited genetic disorder that results in a variety of physical and behavioral characteristics, including obesity, health problems related to obesity and mild to moderate cognitive impairment. (Mayo Clinic, Prader-Willi syndrome <http://www.mayoclinic.com/health/prader-willi-syndrome/DS00922/DSECTION-symptoms> [as of Jan. 26, 2012].) Michelle's arms were short in proportion to her body, which made it difficult for her to hold and feed T.J. She had a weight problem and walked with

difficulty. Overall Michelle tested in the borderline range of intellectual functioning. Her verbal comprehension index score was in the average range. Michelle was generally able to cope with everyday problems. There was no indication Michelle had substance abuse problems or a personality disorder.

Michelle participated in an SDRC assessment. SDRC determined Michelle did not have Prader-Willi syndrome and was not mentally retarded, and did not qualify for their services.

Tracy tested in the lower range of mildly mentally retarded. His condition was not genetic; he had suffered a head injury when he was a child. Tracy did not appear to suffer from any personality pathology. According to the evaluating psychologist, Tracy was capable of utilizing reunification services but his prognosis for reunifying with T.J. was poor.

T.J.'s development was assessed within normal limits. He had asthma, requiring different treatments depending on the severity of his symptoms. T.J. was described as happy and active. He was placed in a concurrent planning home with foster parents who wanted to adopt him.

Michelle and Tracy were provided one supervised visit a week, lasting from three to four hours. The visitation supervisor said Michelle and Tracy demonstrated a parental role with T.J., responded appropriately to his verbal and nonverbal signals, put his needs ahead of their own and consistently displayed empathy toward him. Because of her physical limitations, Michelle found it difficult to diaper T.J., fasten his clothing and take him out of his high chair. She relied on Tracy for assistance.

In October 2010, at the six-month review hearing, the social worker said the parents fully complied with their case plans but still needed instruction and guidance on feeding, holding and clothing T.J. The juvenile court continued family reunification services and authorized the Agency to implement unsupervised visits with notice to minor's counsel, and overnights and a 60-day home visit with the advance concurrence of minor's counsel.

Michelle reapplied for SDRC services but was again denied.

The 12-month review hearing, originally scheduled for March 2011, was continued and heard with T.J.'s 18-month review hearing (and Nancy's jurisdictional and dispositional hearing) on July 25 and 26, 2011. The Agency recommended the court terminate family reunification services and set a section 366.26 hearing for T.J., and provide six months of services in Nancy's case.

The social worker, Anthony Scheri, said Michelle and Tracy actively participated in family reunification services. He concluded they were able to follow directions but did not have the ability to safely parent their children. Scheri questioned the parents' ability to assess T.J.'s asthma symptoms and treat him appropriately.

As an example of the parents' inability to parent their children, Scheri cited a visit supervised by the foster mother on July 13, 2011. Although some details of the foster mother's account of the visit were contradicted by the SDRC professionals present at the visit, the foster mother reported concerns about the children's safety in their parents' care. These included: Michelle gave water to Nancy instead of formula and was unable to take her out of the stroller without assistance; Michelle did not know how to react to T.J.'s tantrum and did not check him for injuries after he threw himself on the floor; Tracy told T.J. to "stay" on a changing table and walked away to throw out the diaper; Tracy left T.J. in a stroller in the middle of the mall and walked 30 to 40 steps away to get a high chair; and Tracy did not check T.J. for injuries after T.J.'s tantrum.

Tonya McCleave, a service coordinator for SDRC for 25 years, provided case management services and independent living skills training to Tracy. By coincidence, McCleave was at the mall on July 13. She also observed an earlier visit at the parents' home. McCleave said Tracy was a loving and caring father. He was able to provide for the children's safety on the two occasions she was present. The home environment was clean. He did not become frustrated when caring for the children. At the mall, Tracy was trying to secure T.J. in a high chair when he realized the safety belt was not working properly. Tracy explained to T.J. he had to keep him safe and found another high chair with a safety belt.

McCleave said the SDRC team did not conduct a parenting assessment of Tracy but had discussed his ability to follow through with the court's requirements. Tracy did not qualify for some SDRC services because he was independent and high functioning in many ways, and was able to follow directions with guidance. Tracy's and Michelle's strengths and weaknesses balanced each other, and they functioned well as a team.

Donna Reyes was an investigator with Dependency Legal Group of San Diego. She previously worked for the Agency as a social worker in the court intervention unit. Reyes observed three visits between the parents and T.J. at the parents' home. Their home was clean. Reyes did not see any safety concerns. Social Worker Stephanie Carter did not have to intervene or correct the parents to avoid any dangerous situations.

Angelica Garcia provided independent living skill services to Tracy and was often in the home. Garcia said Tracy played with T.J. and explained things to him. T.J. followed his father around the house. In the beginning, the social worker would offer suggestions to Tracy. Now Tracy parented T.J. fairly independently. The parents did not need to be reminded to prepare food and feed T.J.

Randene Ostlund also provided independent living services to Tracy. She had 30 years' experience working with adults with developmental disabilities. Ostlund was impressed by Tracy's dedication to T.J. He was very cognizant of T.J.'s safety. Michelle read to T.J. Ostlund said the parents cared for the children as a team. Michelle was articulate and observant but had physical challenges. Tracy was agile, quick and capable of multitasking.

Garcia was present during the visit at the mall when T.J. threw a tantrum. She testified Tracy picked up T.J. and checked him for injuries. When Tracy looked for a high chair, he left T.J. in the care of the others at the visit.

Social Worker Carter supervised the parents' visits with T.J. T.J. liked to follow his father around. They played ball together. Carter said the interactions between T.J. and his parents were "great." The parents were protective and alert. They were able to learn educational material about safety, nutrition and basic childhood necessities. Carter never saw Tracy leave T.J. alone during a diaper change. The only potentially dangerous situation Carter observed in the last year was when T.J. fell and bumped his head. Tracy immediately went to T.J., picked him up in a "very nurturing, very loving" manner and wiped away his tears. Carter showed Tracy a little lump that was starting to form on T.J.'s forehead and advised him to put ice on it.

Carter said Tracy and Michelle could not individually care for T.J. without the other parent's assistance. Carter said she would be uncomfortable leaving T.J. alone with his parents because she did not know how the parents would respond to an emergency. Carter acknowledged the parents knew how to call for help.

The juvenile court found that return to parental custody would be detrimental to T.J. The court stated the parents were "moving in the right direction" but "the time [had] run." In view of the highly structured, supervised visitation, and T.J.'s asthma, the court said it could not find there was a substantial probability the parents would be able to care for T.J. if it continued the 18-month review hearing for three months. The juvenile court found that reasonable services were offered or provided to the parents, terminated reunification services and set a section 366.26 hearing. In Nancy's

case, the juvenile court specified the services to be offered to the parents, and ordered the Agency to implement short, unsupervised visits between the parents and Nancy.

Michelle and Tracy petition for review of the court's orders and request a stay of the section 366.26 hearing. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452.) This court issued an order to show cause and the Agency responded. The parties waived oral argument. On October 28, 2011, this court stayed the section 366.26 hearing.

## DISCUSSION

### A

Michelle and Tracy contend there is not substantial evidence to support the finding that returning T.J. to parental custody would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child (detriment finding). Tracy maintains he was not given a reasonable opportunity to demonstrate he could safely care for his son. Michelle argues she was not offered or provided reasonable family reunification services because the Agency did not tailor the case plan to her disabilities. She further asserts the juvenile court abused its discretion when it did not extend the reunification period.

Each parent joins in and adopts the other's arguments.

### B

■ The purpose of the California dependency system is to protect children from harm and to preserve families when safe for the child. (§ 300.2; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 [33 Cal.Rptr.3d 337].) The focus during the reunification period is to preserve the family whenever possible. (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 507 [27 Cal.Rptr.3d 157].) Until services are terminated, family reunification is the goal and the parent is entitled to every presumption in favor of returning the child to parental custody. (§§ 366.21, 366.22; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 788 [20 Cal.Rptr.3d 336] (*David B.*).) After reunification services are terminated, the focus is to provide the child with a safe, permanent home. (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788 [42 Cal.Rptr.2d 200] (*Elizabeth R.*).)

■ At a status review hearing, the court must return the child to the physical custody of his or her parent unless the Agency proves, by a preponderance of the evidence, that return to the parent would create a

substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) The court may not set a section 366.26 hearing at a six-month or 12-month review hearing unless it finds by clear and convincing evidence reasonable services have been offered or provided to the family. (§ 366.21, subds. (e) & (g)(1).) At the 18-month review hearing, the court may continue the hearing under section 352 if it finds that reasonable family reunification services have not been offered or provided to the parents. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1017 [70 Cal.Rptr.2d 603].)

We review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 [3 Cal.Rptr.2d 217].) " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.]" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 [51 Cal.Rptr.2d 907].) "Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence. [Citations.]" (*Ibid.*)

Tracy contends the social workers' and psychologists' opinions concerning his inability to safely care for T.J. were speculative because he did not have the opportunity to show he was capable of caring for his son. Michelle argues the social workers' concerns about the parents' continued need for support services does not constitute substantial evidence of detriment.

■ Almost 30 years ago our colleagues at the Third District Court of Appeal wrote, "Harm to the child cannot be presumed from the mere fact of mental illness of the parent . . . . The proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety." (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 540 [184 Cal.Rptr. 778] (*Jamie M.*).) The appellate court rejected any inferences or stereotypes to be drawn from a parent's labeled diagnosis, stating such a diagnosis is a starting point, not a conclusion. (*Ibid.*)

This observation applies equally to a nonabusive parent who has a physical or developmental disability. We agree with Tracy that a psychologist's *initial* assessment (completed before the parent has had the opportunity to meaningfully participate in reunification services) does not constitute substantial evidence of *current* detriment to the child. To the extent Social Worker Scheri's conclusions were based solely on the evaluating psychologists' initial opinions and the parents' eligibility for support services, those conclusions do not constitute substantial evidence of detriment. The evidence must

be viewed in light of the disabled parent's response to services and demonstrated ability to safely care for the child, despite that parent's labeled diagnosis, initial prognosis or eligibility for support services. (*Jamie M., supra,* 134 Cal.App.3d at p. 540; accord, *Elizabeth R., supra,* 35 Cal.App.4th at pp. 1789–1790.)

The parents contend the social workers' concerns about their ability to properly feed, clothe, bathe and clean T.J. are insignificant in view of their demonstrated ability to provide basic care to T.J., the positive nature of their interactions with him and available SDRC services to assist them in parenting. They contend they need only provide an adequate level of care for T.J., not an ideal one. (*David B., supra,* 123 Cal.App.4th at p. 789.) The parents' contentions have significant merit.

However, in reviewing the evidence most favorably to the prevailing party, we must conclude there is substantial evidence in the record to support the juvenile court's finding it would be detrimental to T.J.'s health, safety and well-being if immediately returned to the physical care of his parents. (§§ 366.21, subd. (f), 366.22, subd. (a).)

Michelle and Tracy saw T.J. under supervised conditions three to four hours a week. They never parented T.J. on their own. T.J. was diagnosed with asthma. Michelle and Tracy were not trained to recognize or treat his symptoms. They did not attend his medical appointments. SDRC was unable to locate a residential facility for the family and could not provide 24-hour services to Tracy. Under these circumstances, it is reasonable to infer T.J. might suffer serious harm if he had an asthma attack while in the sole care of his parents. Michelle's physical limitations made it difficult for her to respond to T.J. We note the Agency's final court report contains more advocacy than fact, and the evidence barely sustains the detriment finding under the substantial evidence standard of review.

C

Tracy contends he was not offered a reasonable opportunity to demonstrate he could safely care for his son because visitation with T.J. remained limited and supervised. Michelle contends she was not provided services tailored to her physical disabilities. We agree.

Family reunification services play a critical role in dependency proceedings. (§ 361.5; *In re Alanna A.* (2005) 135 Cal.App.4th 555, 563 [37 Cal.Rptr.3d 579]; see 42 U.S.C. § 629a(a)(7).) Reunification services should be tailored to the particular needs of the family. (*David B., supra,* 123 Cal.App.4th at p. 793.) The juvenile court and child welfare agency must

accommodate the special needs of disabled and incarcerated parents. (*Elizabeth R., supra,* 35 Cal.App.4th at p. 1792.)

■ The "adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164 [39 Cal.Rptr.2d 743].) To support a finding reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414 [286 Cal.Rptr. 592].) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R., supra,* 2 Cal.App.4th at p. 547.)

■ We are concerned by the limitation on visitation services that were provided to Michelle and Tracy. Visitation is an essential component of a reunification plan. (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580 [114 Cal.Rptr.2d 499].) To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A); *In re Alvin R.* (2003) 108 Cal.App.4th 962, 972 [134 Cal.Rptr.2d 210].) Here, Michelle and Tracy never received more than four hours a week of supervised visitation services.

Early in the dependency proceedings, a visitation supervisor said the parents demonstrated a parental role with T.J., responded appropriately to his verbal and nonverbal signals, put his needs ahead of their own and consistently displayed empathy toward him. Later, the professionals involved in the case characterized the parents' interactions with T.J. as "great," "very protective," "very loving and adoring," "protective [and] alert," "very nurturing, very loving," and "comfort[ing]." They also said Tracy was a "very loving, caring father" and "very cognizant of [T.J.'s] safety." Social Worker Carter said the parents had a basic understanding of how to care for T.J.

Despite reports the parents were protective of T.J.'s safety, the record shows the Agency did not advance the parents' visitation services. In explaining the limited visitation, Carter said she would feel "uncomfortable" leaving T.J. alone with his parents. Yet Carter described only one incident in more than a year that may have implicated T.J.'s safety—when T.J., who was learning to walk, fell and bumped his head. The record shows Tracy picked his son up, wiped away his tears and followed Carter's advice to put ice on a small lump on T.J.'s head.

When the Agency limits visitation in the absence of evidence showing the parents' behavior has jeopardized or will jeopardize the child's safety, it unreasonably forecloses family reunification on the basis of the parents' labeled diagnoses, and does not constitute reasonable services. (Cf. *Jamie M., supra,* 134 Cal.App.3d at p. 540.) Here, Michelle and Tracy fully cooperated with the Agency, made substantial progress with their court-ordered case plans and demonstrated their abilities to feed, soothe, protect and care for T.J. Garcia said Tracy parented T.J. fairly independently. McCleave and Ostlund emphasized the parents' ability to work as a team and the complementary nature of their skills. The Agency's concerns about unsupervised visitation could have been alleviated by scheduling services from SDRC and the public health nurse and implementing in-home parenting skills training during a portion of the unsupervised visits, and providing initial drop-in checks by the social worker. Under these circumstances, the visitation services provided to reunify this family were clearly unreasonable.

The juvenile court's order directing the Agency to implement specific services in Nancy's case reveals the deficiencies in services in T.J.'s case. Significantly, the court found it necessary to manage services and visitation in Nancy's case. The court ordered the Agency to implement short, *unsupervised* visits with Nancy; notify the parents of, and encourage them to attend, Nancy's medical appointments; *not* allow the foster mother to supervise visits; engage the services of the public health nurse; refer the parents to the Step into Success program (a parenting program for parents with disabilities); and follow up with SDRC to obtain services for Michelle.

In contrast, with the exception of assisting Michelle with her SDRC application, the parents did not receive the services the juvenile court deemed important for family reunification in Nancy's case. The parents were not informed about T.J.'s medical appointments until they were over. They did not receive any instruction on how to recognize T.J.'s asthma symptoms and treat him appropriately, which directly undermined their ability to reunify with him. The parents did not have the assistance of the public health nurse. They were not referred to the Step into Success program, which provides parenting instruction as well as independent living services to parents with disabilities. We also note SDRC did not conduct a parenting assessment of Tracy. Although services need not be perfect, they must be designed to remedy the family's problems and accommodate the special needs of disabled parents. (*In re Misako R., supra,* 2 Cal.App.4th at p. 547; *In re Riva M., supra,* 235 Cal.App.3d at p. 414; *Elizabeth R., supra,* 35 Cal.App.4th at p. 1792.)

The record also indicates that Michelle was not offered or provided reunification services designed to address her physical disabilities, which impeded her ability to care for a young child. A developmentally or physically disabled parent is entitled to services that are responsive to the family's

special needs in view of the parent's particular disabilities. (*Elizabeth R., supra*, 35 Cal.App.4th at p. 1790.) The evaluating psychologist said Michelle's clinical presentation was unusual and required ongoing assessment. In October 2010 a social worker recommended that Michelle have an evaluation by a medical professional to determine if she had Prader-Willi syndrome. That did not occur. If Michelle did not have Prader-Willi syndrome, as SDRC determined, was her condition treatable? If the Agency disagreed with SDRC's assessment, why did it not try to locate alternate services for Michelle? Would Michelle have made progress in her ability to care for T.J. if she received occupational or physical therapy, or parenting skills training appropriate to her disabilities? The record does not support a finding the Agency adequately identified Michelle's problems and provided services responsive to her needs. (*In re Riva M., supra*, 235 Cal.App.3d at p. 414; *Elizabeth R., supra*, 35 Cal.App.4th at p. 1790.)

 We conclude there is not substantial evidence to support the juvenile court's finding reasonable family reunification services were offered or provided to Michelle and Tracy. Despite their full cooperation with the Agency, positive reports from service professionals, their devotion to T.J. and the availability of significant support services through SDRC, Michelle and Tracy have not had a reasonable opportunity to show they are able to parent their child. They are entitled to that opportunity. (§§ 300.2, 361.5, 16501; 42 U.S.C. § 629a(a)(7); see *In re Alanna A., supra*, 135 Cal.App.4th at p. 563; *Elizabeth R., supra*, 35 Cal.App.4th at p. 1792.)

In view of the lack of reasonable reunification services and the absence of any physical or emotional abuse in this special needs family, we conclude there is good cause to continue the 18-month review hearing for six months. (*Elizabeth R., supra*, 35 Cal.App.4th at pp. 1792, 1798–1799; *Mark N. v. Superior Court, supra*, 60 Cal.App.4th at pp. 1016–1017.)

## DISPOSITION

Let a writ of mandate issue directing the juvenile court to (1) vacate its finding reasonable services were offered or provided to the parents; (2) vacate its order terminating reunification services and setting a permanency planning hearing under section 366.26; (3) continue the 18-month review hearing for six months; (4) order the Agency to expand the parent's visitation with T.J., including unsupervised visitation as appropriate; (5) order the Agency to provide services to the parents that are, at minimum, equivalent to the services the court ordered in Nancy's case on July 26, 2011; (6) request a

parenting assessment of Tracy by SDRC; and (7) refer Michelle to a medical professional to determine whether she has Prader-Willi syndrome or other conditions.

The stay issued October 28, 2011, is lifted.

McDonald, Acting P. J., and Aaron, J., concurred.