Filed 4/19/13  Michelle B. v. Superior Court CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHELLE B. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF SAN DIEGO COUNTY, <br><br> Respondent; <br><br>——————————<br><br> SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Real Party in Interest. | D063054 <br><br><br> (San Diego County <br> Super. Ct. No. 517708A-B) |

PROCEEDINGS in mandate after referral to a Welfare and Institutions Code section 366.26[1] hearing.  Ronald F. Frazier, Judge.  Petitions denied; requests for stay denied.

Michelle B. and Tracy J. seek review of a juvenile court order setting a hearing under section 366.26.  They challenge the juvenile court's findings that it would be detrimental to return their children to their care, that there was no substantial probability that their children

_____

1    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

would be returned home within the next six months, and that reasonable services were provided to them. We deny the petitions.

FACTUAL AND PROCEDURAL BACKGROUND

Michelle and Tracy are the parents of T.J., who is now three years old, and Nancy J., who is almost two years old (together, the children). Michelle and Tracy are developmentally disabled. Michelle tested in the borderline range of intellectual functioning. She has physical conditions that limit her agility and mobility. Tracy was diagnosed with cognitive disorder and mild mental retardation. Shortly after their respective births, T.J. and Nancy were adjudicated dependents of the juvenile court and removed from the custody of their parents. T.J. and Nancy are placed in the same foster home.

T.J. suffers from severe asthma. In all other respects the children are healthy and reaching normal developmental milestones.

In July 2011, the juvenile court held both a 12-month review hearing in T.J.'s case and the jurisdictional/dispositional hearing in Nancy's case.[2] In T.J.'s case, the juvenile court terminated family reunification services and set a section 366.26 hearing. In Nancy's case, the juvenile court ordered a plan of family reunification services and specifically ordered the Agency to implement short, unsupervised visits between Nancy and her parents; to notify the parents of, and encourage them to attend, her medical appointments; not to allow the foster mother to supervise visits; to engage the services of the public health nurse; to refer the parents

---

[2] On our own motion, we take judicial notice of this court's opinions in *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415 (*Tracy J.*) and *In re Nancy J.* (Feb. 16, 2012, D060221) [nonpub. opn.] (*Nancy J.*). (Evid. Code, § 452, subds. (a) & (d).) The early history of the parents' reunification efforts are described in those opinions.

2

to Step into Success, a parenting program for parents with disabilities; and to follow-up with the San Diego Regional Center (SDRC) to obtain services for Michelle. (*Tracy J.*, at p. 1427.)

Michelle and Tracy petitioned for review of the order setting a section 366.26 hearing in T.J.'s case, and appealed the jurisdictional and dispositional findings and orders in Nancy's case. This court affirmed the juvenile court's findings and orders in Nancy's case. (*Nancy J.*, *supra*, D060221.) In T.J.'s case, this court determined that reasonable services had not been provided to the parents, and remanded the case to the juvenile court with directions to vacate the order setting a section 366.26 hearing, to continue T.J.'s 18-month review hearing for six months, and to order the Agency to: (1) expand the parent's visitation with T.J., including unsupervised visitation as appropriate; (2) provide services to the parents that are at minimum equivalent to the services that the juvenile court ordered in Nancy's case; (3) request a parenting assessment of Tracy by SDRC; and (4) refer Michelle to a medical professional to determine whether she has Prader-Willi syndrome or other conditions. (*Tracy J.*, *supra*, 202 Cal.App.4th at pp. 1428-1429.)

In December 2011, the juvenile court implemented a new case plan in T.J.'s case. The social worker arranged for Michelle and Tracy to attend T.J.'s appointments at Children's Hospital Asthma Clinic for training to recognize the signs, symptoms and triggers of asthma, administer appropriate medication and provide inhaler and nebulizer treatment. The parents no longer qualified for public health nurse assistance, which is designed for prenatal and newborn care. They were participating in ACT, a program for parents with disabilities that is equivalent to the Step into Success program.

The social worker asked SDRC support staff to encourage Michelle to make a doctor's appointment and to help her reapply for SDRC services once she obtained additional information about her condition. The Agency said that if additional services were recommended, it would help Michelle obtain physical therapy, occupational therapy or other services.

Michelle and Tracy participated in follow-up psychological evaluations. Joyce A. Dingwall, Ph.D., who conducted psychological evaluations of Michelle in April 2010 and October 2011, said that Michelle appeared to have learned many skills during the past year and that she had benefitted from services. Dr. Dingwall reserved judgment as to whether Michelle would benefit from services to the extent that she would be able to safely and independently parent her children.

Alan R. Flitton, Psy.D., conducted psychological evaluations of Tracy in April and July 2010, and August 2011. Dr. Flitton stated, "It is clear that Mr. J[.] continues to suffer from various cognitive deficits that will interfere with his ability to parent effectively *independently*. These deficits include, but are not limited to, memory, reasoning, understanding, judgment, insight, planning and decision[]making, and the ability to give adequate foresight into potential consequences." Dr. Flitton noted that Randene Ostlund, Tracy's independent skills (ILS) worker, believed that the parents could adequately care for their children with supportive services because they did not have any mental health or personality disorders, or substance abuse or domestic violence issues.

In view of the differing opinions about Michelle's and Tracy's ability to safely and independently care for the children, Dr. Dingwall recommended that a neutral psychological

4

evaluator conduct a limited evaluation of the parents with their children to address the appropriateness and safety of parental behaviors and emotions, the quality of parent/child interactions and any other parameter that might help in assessing whether reunification posed quantifiable or qualitative risks to the children's safety and well-being.

The juvenile court authorized a neutral evaluator to observe the parents and children in the parents' home. Later, Dr. Dingwall reported that she had not been able to locate a psychologist who was willing to complete a limited evaluation of the parent/child interactions. She recommended that the evaluation be conducted by a qualified professional who had not previously been involved in the case. The Agency said that it would continue to seek a qualified clinician to conduct a neutral professional assessment of the parent/child relationships.

In February, the children's pediatrician, Jessica Coullahan, M.D., expressed concerns about the parents' ability to safely care for the children. Dr. Coullahan said that the parents were affectionate and loving with the children but lacked common sense when it came to the children's care. On one occasion, the parents left Nancy unattended on the examining room table, despite repeated reminders that it was unsafe to leave her alone. The parents had difficulty picking up Nancy's cues when she started to cry or fuss. Dr. Coullahan said that the parents did not appear to have the ability to identify medical conditions that would pose a risk to their children's health and safety, such as irregular breathing or fever. She recommended that the parents not have lengthy unsupervised visits with the children.

At a visit in February, T.J. pulled away from Michelle while Tracy was putting Nancy into her car seat, and ran down the sidewalk toward the street. Michelle pursued him, but he

5

continued to run. Michelle initially followed T.J., but stopped to seek assistance from Tracy, who was trying to buckle Nancy into her car seat. When Nancy began to cry, Michelle and Tracy turned to the baby and ignored T.J., who was playing in a puddle approximately 20 to 25 yards away. According to the social worker, the parents left T.J. unattended for four minutes.

At Nancy's birthday party, T.J. ran toward the street. His parents did not realize that he was gone. The foster mother ran to get T.J. She returned with T.J. without the parents having noticed his absence. In another incident, Tracy left Nancy unattended on a bed. Nancy crawled off the bed and fell on her head. She was not hurt. Michelle was nearby but was unable to move quickly enough to prevent Nancy from falling.

In June, at the foster parent's home, T.J. had a severe asthma attack, which required emergency treatment and hospitalization. The day after T.J. was admitted to the hospital, Michelle and Tracy attended a doctor's appointment at which T.J.'s asthma plan was discussed. The parents did not appear to pay attention to the doctor and were not able to answer his questions.

In August, Michelle and Tracy received an eviction notice due to noncompliance with their landlord's request to treat a pest problem. In mid-August, they notified the Agency that they intended to rent an apartment with the children's maternal grandmother, who would help them with the children's care. The juvenile court continued the review hearings to allow the Agency to assess whether the children could safely live with their parents and grandmother.

In early September, Michelle and Tracy moved to a downtown San Diego hotel that was frequented by transients and the mentally ill. It was not a safe environment for them. They

6

lost contact with the social worker, Ostlund, the foster parent and their children, for approximately three weeks.

At some point in time between late September and early October, the parents moved into an unfurnished three-bedroom apartment with the maternal grandmother. On October 10, the social worker made an unannounced visit to assess the parents' circumstances. During the visit, Tracy placed Nancy in a lawn chair and turned his back. She started to reach for a toy on the floor and nearly tumbled out of the chair. Michelle tried to get Tracy's attention, but she did not move to help Nancy. Later, the smoke detectors in the apartment complex went off. Tracy walked to the front door of the second-story apartment and looked outside. He left the front door open. The social worker and the children's court-appointed special advocate (CASA) walked outside to make sure that the children did not go out the front door. Although the maternal grandmother commented on the safety hazards, she did not intervene to protect the children or correct the parents.

T.J.'s 18-month review hearing and Nancy's 12-month review hearing were heard concurrently on November 2, 5, 16, 19 and 28. The juvenile court admitted in evidence the Agency's reports, the CASA's report and the parents' exhibits, and heard testimony from the foster mother, social worker Anthony Scheri, the CASA, Tracy, Michelle and ILS worker Ostlund. We briefly summarize the evidence that is relevant to the issues raised in this proceeding.

The evidence showed that Michelle and Tracy fully participated in their case plans. They successfully completed courses in parenting education, child development, nutrition, CPR and first aid. During the parenting classes, they were very attentive to their children's

7

needs. The parents visited the children regularly and attended their medical appointments and hospitalizations. They were loving, calm, gentle and affectionate with the children.

Social worker Scheri recommended that the juvenile court terminate reunification services and set a section 366.26 hearing. He said that even after having worked on their parenting skills for three years, the parents did not show the ability to apply what they had learned in real life situations. Scheri did not believe that the grandmother understood that her role was to ensure the children's safety. Michelle and Tracy engaged in fundamentally unsafe parenting, such as putting a one-year-old child in a chair and walking away, and leaving the outside door of a second-story apartment open while the children were present. In addition, T.J. had severe asthma. His life depended on rapid intervention in a medical emergency. Scheri said that due to their developmental disabilities, the parents were unable to adapt to changing circumstances, make safety decisions and protect the children.

Ostlund testified that the parents required assistance to be able to care for their children. If the children were returned home, SDRC could provide up to 60 hours of in-home services per month.

The CASA said that Michelle and Tracy did well in highly structured settings with guidance and redirection, but they did not appear to be capable of managing the children on their own. The CASA believed that the parents clearly cared about their children and said that they were working hard to be able to reunify with the children.

Michelle testified that she was capable of taking care of her children with help. Tracy said that he was able to parent the children. He said that Michelle and Ostlund had helped him to become a better parent.

8

The juvenile court stated that Michelle's and Tracy's efforts to reunify their family were extraordinary and that they had made substantial progress with their case plans in all areas but one. Citing the number of incidents that had jeopardized the children's safety, the juvenile court found that the parents' limited ability and capacity to assess, and respond to, an emergency created a substantial risk of detriment to the children's safety, protection and well-being. The juvenile court found that there was not a substantial probability that the children could be returned to the parents' care within the next six months, and that reasonable services had been provided to the parents. The court proceeded to set a section 366.26 hearing.

Michelle and Tracy each petitioned for review of the court's order under California Rules of Court, rule 8.452. In addition, they join in each other's petition. The parents request that this court reverse the order setting a section 366.26 hearing. This court issued an order to show cause, the Agency responded and the parties waived oral argument.

## DISCUSSION

### A

*There Is Substantial Evidence to Support the Juvenile Court's Finding That Reasonable Services Were Offered or Provided to Reunify the Family*

Michelle and Tracy argue that reasonable visitation services were not provided to them. In addition, they contend that they were not offered or provided reasonable services because the Agency did not adequately train them to administer T.J.'s asthma treatment, request a parenting assessment for Tracy or help Michelle obtain a court-ordered psychological assessment and medical evaluation. Finally, the parents assert that they were denied reasonable services because the Agency conducted only a cursory evaluation of the maternal grandmother's ability to assist them with their children.

9

Family reunification services play a critical role in dependency proceedings. (§ 361.5; *In re Alanna A*. (2005) 135 Cal.App.4th 555, 563; *In re Joshua M*. (1998) 66 Cal.App.4th 458, 467; see 42 U.S.C. § 629a(a)(7).) Services "may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children." (§ 300.2.) Reunification services should be tailored to the particular needs of the family. (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793-794 (*David B*.), citing *In re Alvin R*. (2003) 108 Cal.App.4th 962, 972.)

At each review hearing, the court is required to determine the "extent of the agency's compliance with the case plan" in making reasonable efforts to return the child to a safe home. (§ 366, subd. (a)(1)(B).) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R*. (1991) 2 Cal.App.4th 538, 547.) To support a finding that reasonable services were offered or provided to the parent, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M*. (1991) 235 Cal.App.3d 403, 414.) The "adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164 (*Robin V*.).) If reasonable services are not provided or offered to the parent, the court is required to continue the case for the period of time permitted by statute. (See § 366.21, subds. (e) & (g)(1).)

10

We review a reasonable services finding to determine if it is supported by substantial evidence. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 413-414.) The burden is on the petitioner to show that the evidence is insufficient to support the juvenile court's findings. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

1. *Visitation services*

In December 2011, the juvenile court implemented a new visitation plan. The plan provided for three hours of in-home visitation once a week, including a one-hour unsupervised visit. The parents would also have additional visits with the children at the children's medical appointments, "Mommy & Me" classes and language enhancement classes.

By March 2012, visitation was occurring two or three times a week. On Tuesdays, the parents and the children participated in a two-hour "Mommy & Me" class, which was followed by an unsupervised visit for one to one and one-half hours (Tuesday visits). On Wednesdays, when Ostlund helped Tracy with independent living and parenting skills, the children stayed with the parents for approximately six hours (Wednesday visits). One hour of the Wednesday visit was reserved for unsupervised visitation. On alternate Thursdays, the parents had an unsupervised visit with the children for one and one-half to two hours at a park in North San Diego County (Thursday visits).

Ostlund provided transportation to the parents for the Tuesday visits and for most of the children's medical appointments, and shared transportation responsibilities for the children with the foster mother on Wednesdays. The foster mother transported the children on Tuesdays, and took them to all of their medical appointments. The Agency expected the parents to provide their own transportation to the Thursday visits in North San Diego County

11

from their home in East San Diego County. The parents relied on public transportation. Their travel time to the Thursday visits was approximately four to five hours each way. From January through May, the parents regularly attended the Thursday visits. They attended another visit in August and then stopped. Michelle explained that the 10-hour round trip was too difficult for them.

Ostlund described the 10-hour round trip as "horrific" for the disabled parents and testified that she had asked Scheri to rearrange the visitation schedule. After the "Mommy & Me" classes ended, Ostlund observed that the parents were missing out on their visitation and offered to supervise one or two more visits each week. Ostlund testified that Scheri did not respond to Ostlund's request to rearrange the visits or to her offer to supervise the visits.

Scheri acknowledged that once the "Mommy and Me" classes ended, Michelle and Tracy no longer visited the children on Tuesdays, and further acknowledged that Ostlund had asked him to expand visitation services. He testified that he had discussed the issue with his supervisor, who had said that the Agency was not inclined to expand visitation because the parents were not taking advantage of the Thursday visits. Scheri acknowledged that the parents had to travel 10 hours to attend the Thursday visits. He said, "I was open to look into [changing the visitation schedule], but like I said, it was the visitation schedule that we had already previously arranged." Scheri said that he had explained the transportation problems to his supervisor, but the supervisor said that it was "the parents' responsibility to get to the visits."

The record shows that visitation services increased from December 2011 to March 2012, but decreased during the summer and after August 2012, when the "Mommy & Me"

12

classes ended and Michelle and Tracy decided not to attend the Thursday visits because of the difficult commute. At the time of the November hearing, the parents had visitation with the children every Wednesday for six hours, including one hour of unsupervised visitation. The record shows that the Agency was unwilling to reschedule the Tuesday visits or otherwise expand visitation until the parents regularly attended the Thursday visits as "previously arranged."

To promote family reunification, visitation must be as frequent as possible, consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A); *In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 972.) "Visitation between a dependent child and his or her parents is an essential component of a reunification plan, even if actual physical custody is not the outcome of the proceedings." (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580; *In re J.N.* (2006) 138 Cal.App.4th 450, 458.)

We are disappointed that the Agency would think that it is reasonable to require any parent, let alone a developmentally disabled parent, to regularly travel 10 hours to visit his or her child during the reunification period. (See §§ 16501.2, subd. (c), 16000; Fam. Code, § 7950, subd. (a).) We reject the Agency's argument that the visitation arrangement was reasonable per se because the children and parents resided in the same county. (See *In re Anthony T.* (2012) 208 Cal.App.4th 1019, 1030-1031 [describing factors that determine whether the child's placement will facilitate reasonable visitation]; *David B.*, *supra*, 123 Cal.App.4th at p. 793 [services must be tailored to meet the family's needs].) The Agency's refusal to reinstate Tuesday visits, to expand visitation or to modify the Thursday visits until the parents resumed the Thursday visits without modification or assistance, placed the parents

13

in a "Catch-22" situation. (See Heller, Catch-22 (1961).) It is particularly egregious in this case because Michelle's and Tracy's efforts to comply with their case plans were exemplary.

The Agency's recalcitrance contravenes the long-standing rule that the Agency is required to make reasonable efforts to assist the parents in areas where compliance proves difficult, including providing transportation services (or modifying the location of the visits). (*In re Riva M.*, *supra*, 235 Cal.App.3d at p. 414; *Robin V.*, *supra*, 33 Cal.App.4th at p. 1165; *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.) Even if the Agency believed that Michelle and Tracy were unlikely to regain physical custody of the children, it had a continuing obligation to provide visitation services as frequently as possible, consistent with the well-being of the children. (§ 362.1, subd. (a)(1)(A); *Tracy J.*, *supra*, 202 Cal.App.4th at p. 1428 [ordering expanded visitation on remand]; *In re Mark L.*, *supra*, 94 Cal.App.4th at p. 580; *In re J.N.*, *supra*, 138 Cal.App.4th at p. 458; see also § 366.26, subd. (c)(1)(B)(i) [regular contact and visitation plays a role in establishing a beneficial parent/child relationship].)

As much as we take issue with the Agency's poorly-reasoned decision with respect to visitation, it is our obligation to review the evidence most favorably to the prevailing party and to indulge in all legitimate and reasonable inferences to uphold the court's ruling. (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 545.) The record shows that the juvenile court and the Agency complied with this court's directive to expand visitation services, including unsupervised visitation as appropriate, and that the parents received adequate visitation services throughout most of the review period. (*Tracy J.*, *supra*, 202 Cal.App.4th at p. 1428.)

14

In December 2011, the Agency implemented a three-hour weekly visit in the parents' home, including a one-hour unsupervised visit. Despite the onerous transportation requirements, the record shows that the parents had unsupervised visits with the children on alternate Thursdays from January through May, without complaint, and attended another visit in mid-August. By March, the Agency had expanded the Wednesday in-home visits and added the Tuesday visits. In addition, Michelle and Tracy were informed of the children's medical appointments and hospitalizations, and had the opportunity to parent their children at those times. The parents did not visit their children for three weeks in September.

While the Agency's refusals to modify the parents' visitation schedule to eliminate the 10-hour commute on Thursdays and reinstate the Tuesday visits were unjustified, the error occurred approximately four months after the 18-month review date in T.J.'s case and three months after the 12-month review date in Nancy's case. (See §§ 361.5, subd. (a)(1), 366.21, subd. (f) & 366.22.) The record shows that during the review period, the parents received more than eight months of reasonable visitation services.[3] Thus, the record contains substantial evidence to support the finding that reasonable visitation services were offered or provided to the parents.

---

[3] The parents also argue that visitation services were unreasonable because they did not attend T.J.'s language enhancement classes, which were part of the Agency's December 2011 visitation plan. The record does not support the parents' assertion. The record shows that T.J.'s language enhancement classes began on November 10, 2011, and concluded six weeks later, on or about December 15, four days before the juvenile court authorized the new visitation plan. The record does not indicate that T.J.'s language enhancement classes were ongoing or that the parents were denied the opportunity to attend.

2.    *Asthma Treatment Training*

Michelle and Tracy contend that they did not receive reasonable services because the Agency did not include hands-on training in administering T.J.'s asthma medication and other treatment. They contend that the Agency trained them only once to administer T.J.'s daily asthma treatments, and that the social worker should have set up a morning visit to provide a special training session.

We are not persuaded by the parents' argument that the training that they received in administering T.J.'s asthma plan was deficient. Michelle and Tracy acknowledge that they had a hands-on training in administering T.J.'s asthma treatment. The record shows that the parents received regular training and instruction on T.J.'s asthma plan. T.J.'s physicians instructed the parents in how to recognize asthma symptoms and reviewed the asthma plan with them. The parents received copies of T.J.'s asthma plan during his pediatric and specialist appointments, emergency room visits and hospitalizations. Ostlund testified that she reviewed T.J.'s asthma plan with the parents two or three times a month. During T.J.'s hospitalization in June, the physician reviewed the asthma plan with the parents. On that occasion, the parents did not appear to pay attention to the physician, and were unable to answer his questions. The physician then had a respiratory therapist review the asthma plan with the parents. She had to pause repeatedly to get their attention. Although the therapist explained all the steps of T.J.'s asthma plan to the parents as clearly and simply as she could, she remained concerned about their ability to understand the plan and to follow through with the treatment. In September, when T.J. was again hospitalized after an asthma attack, the physicians informed the parents about his necessary treatment and aftercare appointments.

16

The Agency made reasonable efforts to educate and train the parents with respect to T.J.'s asthma treatment plan. The Agency could reasonably conclude that it was not in T.J.'s best interests for the parents and foster mother to share responsibility for administering that treatment, or to disrupt T.J.'s established daily schedule to allow the parents to provide a portion of his treatment.

3.      *Tracy's Parenting Assessment*

Michelle and Tracy contend that they were not provided reasonable services because the Agency did not comply with this court's directive to request a parenting assessment of Tracy by SDRC. They argue that such an assessment would have allowed the Agency to provide individualized and specific services to Tracy to facilitate reunification.

The record shows that the Agency's new case plan did not include a formal parenting assessment of Tracy by SDRC. Instead, the Agency consulted with SDRC to provide more specific services to Tracy and Michelle. The record does not indicate that any party objected to Tracy's new case plan or requested that the plan include a formal parenting assessment.[4]

The record also shows that Ostlund had provided independent living and parenting services to developmentally disabled persons for more than 27 years. She worked closely with Tracy under the auspices of ACT, a program that SDRC had selected for Tracy. Ostlund provided individualized parenting instruction to Tracy, adjusting the method and content as needed. In that capacity, Ostlund continually assessed Tracy's needs for parenting instruction.

In addition to Ostlund's ability to adapt her instruction to meet Tracy's needs, the record shows that the Agency arranged for Tracy to undergo three psychological evaluations. The

_____

4      The record transcript of the hearing on December 19, 2011, at which the juvenile court found that the new case plan was appropriate, is not included in the record.

17

third evaluation was filed in the juvenile court record after this court issued its decision in *Tracy J.* This evaluation contains an assessment of Tracy's ability to safely parent his children. Dr. Flitton, who conducted the evaluation, concluded that Tracy continued to suffer from various cognitive deficits that interfered with his ability to effectively and independently parent his children because Tracy's memory, reasoning, understanding, judgment, insight, planning and decision making, and his ability to recognize potential consequences, were impaired.

In view of the juvenile court's authorization of an informal parenting assessment in Tracy's new case plan, the individualized parenting training that was provided to Tracy by an experienced provider and Tracy's three psychological evaluations assessing his ability to benefit from services and safely parent his children, we conclude that Tracy received reasonable services to assess his parenting skills and provide individualized and specific services to him to facilitate reunification.

4.    *Michelle's Psychological Evaluation and Medical Referral*

Michelle and Tracy argue that services were inadequate because the Agency did not obtain a limited evaluation of Michelle by a neutral evaluator, as recommended by Dr. Dingwall and ordered by the juvenile court on January 24, 2012. In support of their position, Michelle and Tracy rely on *In re K.C.* (2012) 212 Cal.App.4th 323, 333-334 (*K.C.*), in which the reviewing court reversed a reasonable services finding because the social services agency did not provide a recommended psychotropic medication evaluation to the parent.

In contrast to the limited efforts made by the social services agency in *K.C.* to assist the parent, here the Agency contacted medical professionals to determine whether Michelle had Prader-Willi syndrome, referred her for a medical consultation, arranged for support services

18

and encouraged her to contact her doctor to schedule an appointment. The record shows that unlike the parent in *K.C.*, Michelle was capable of obtaining and following through with her own medical treatment. Ostlund testified that Michelle was capable of setting up her own medical appointments and that Michelle preferred to remain as independent as possible. Thus, the record shows that the Agency met its obligation to "refer Michelle to a medical professional to determine whether she has Prader-Willi syndrome or other conditions."[5] (*Tracy J.*, *supra*, 202 Cal.App.4th at p. 1429.)

The parents' contend that the Agency did not secure a neutral professional assessment of Michelle's relationship with the children, as ordered by the juvenile court. The record supports this contention. The Agency attempts to justify its failure to find a qualified neutral professional by asserting that the order for the neutral professional assessment was not a part of this court's disposition in *Tracy J*. The Agency's argument is disingenuous. The record clearly shows that *the juvenile court* directed Michelle to undergo a limited psychological evaluation by a neutral evaluator, and ordered the Agency to "contact Dr. Dingwall to determine what specifically is being requested." The juvenile court specifically authorized the neutral evaluator to observe the parents in their home with the children.

The record shows that the Agency complied with the juvenile court's order to contact Dr. Dingwall. Dr. Dingwall said that she had been unable to locate a psychologist to complete a limited evaluation of the parent/child interactions, and recommended instead that the evaluation be conducted by another qualified professional, such as an in-home parenting coach

---

5    While investigating the procedures necessary to diagnose Prader-Willi syndrome, the Agency obtained information showing that Michelle had been tested when she was a teenager and those tests showed that she did not have Prader-Willi syndrome.

with no previous involvement in the case. The Agency then contacted the public health nurse, who said that the parents did not qualify for the service because the children were not in their care. The Agency also contacted the Chadwick Center, which did not have any clinicians who could perform an assessment of Michelle's interactions with the children.

Unlike the social services agency in *K.C.*, whose only attempt to secure a recommended pharmacological evaluation for the mentally ill parent was to send the parent to a public mental health clinic, and made no further efforts to assist the parent when he did not meet the clinic's criteria for treatment, the record shows that the Agency made reasonable efforts to comply with the juvenile court's order. (*K.C.*, *supra*, 212 Cal.App.4th at p. 329.) While Michelle's assessment services were not perfect, they included two psychological evaluations, reports from neutral professionals who observed her with the children during parenting and "Mommy & Me" classes, and favorable observations from Ostlund, who observed Michelle with the children every week. The record shows that Michelle received the necessary referrals for a medical evaluation and that she also received parenting assessments from different providers.

5.    *The Agency's Assessment of the Maternal Grandmother's Role*

Tracy and Michelle contend that they were denied reasonable reunification services because the Agency did not conduct an adequate assessment of whether the maternal grandmother's presence in their home would allow them to safely care for the children. They argue that the Agency conducted a cursory assessment that unreasonably prejudiced their ability to reunify with their children.

In August 2012, after the Agency learned that the maternal grandmother was willing to share a home with the parents, it asked the juvenile court to continue the review hearings to

20

allow the social worker to complete an investigation of the maternal grandmother's capacity to follow through and protect the children, the parents' new home and the interactions among the family members.

The Agency conducted initial background checks of the maternal grandmother and met separately with her and the parents. In October, the social worker made an unannounced visit to the parents' new home. The maternal grandmother told the social worker that she planned to observe the parents with their children to gain insight to see where she would best fit in. She was concerned about encroaching on Tracy's autonomy and authority. The social worker told the grandmother that her role was to assist the parents in parenting. During the visit, the grandmother did not assist or correct the parents when safety issues arose. The grandmother had not come forward earlier in the case to help the parents with the children, and Scheri testified that there was no guarantee that the grandmother would continue to live with the parents if the children were returned home.

The Agency was not evaluating the maternal grandmother as the children's guardian or adoptive parent. Rather, it was conducting an assessment of the parents' home to see whether their circumstances were sufficiently changed to allow the children to safely return home, with support services. The Agency concedes that the better practice would have been to assess the grandmother's interactions with the family more than once. However, the record shows that the Agency asked the juvenile court for additional time to conduct an assessment, performed initial background checks, interviewed the grandmother and the parents, waited until the parents and grandmother had time to settle into their new home and then observed the grandmother's interactions with the parents and children. Even after the social worker advised

21

the grandmother that her role was to protect the children, the grandmother continued to act as an observer and did not intervene in any of the safety issues that arose during the visit. Thus, there is substantial evidence to support the finding that the Agency's evaluation of the parents' new home and grandmother's ability to ensure the children's safety was reasonable.

The record shows that during the last review period, Michelle and Tracy were provided with reasonable reunification services. Those services included extensive in-home parenting support, parenting education classes, parenting assessments, visitation, the opportunity to parent the children during their medical appointments and hospitalizations, and medical referrals. There is substantial evidence to support the juvenile court's finding that reasonable reunification services were offered or provided to the parents.

B

*The Juvenile Court Did Not Abuse Its Discretion When It Denied the Parents' Requests to Extend Reunification Services*

Michelle and Tracy contend that the juvenile court erred when it denied their requests to extend services in the children's cases for another six months. They maintain that they clearly proved that they could provide a safe home for the children.[6] (§ 366.21, subd. (g)(1).)

When a child is removed from parental custody, unless specified exceptions apply, the juvenile court must order family child welfare services for the child and the parent to facilitate

---

[6] The parents recognize that T.J. does not fall within the statutory parameters of section 366.21, subdivision (g)(1), which applies when the court is asked to extend services to the 18-month review hearing. They contend that the juvenile court erred when it did not grant a continuance in this case. (§ 352.) Because the rationale for denying an extension of services in Nancy's case supports the denial of the requests for a continuance in T.J.'s case, we need not distinguish between the cases in our analysis. We also note that continuances in juvenile dependency proceedings are disfavored, particularly when they infringe on statutory timeframes. (*In re David H*. (2008) 165 Cal.App.4th 1626, 1635.)

22

family reunification.  (§ 361.5, subds. (a) & (b).)  For a child under three years of age on the date of the initial removal from parental custody, reunification services are presumptively limited to six months, and may be provided "no longer than 12 months from the date the child entered foster care . . . ."  (*Id.*, subd. (a)(1)(B).)

At the 12-month review hearing, if the child is not returned to parental custody, the juvenile court has the discretion to continue the case to the 18-month review date, set a section 366.26 hearing, or order a permanent plan of long-term foster care for the child. (§ 366.21, subd. (g)(1), (2) & (3).)  The juvenile court may extend services to the 18-month review date to the parent only if the court finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent and safely maintained in the home within the extended period of time. (§§ 361.5, subd. (a)(3), 366.21, subd. (g)(1).)

To find a substantial probability that the child will be returned to parental custody and safely maintained in the home, the juvenile court is required to find all of the following:

> "(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child.
>
> "(B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home.
>
> "(C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."  (§ 366.21, subd. (g)(1).)

The juvenile court reasonably determined that although the parents regularly visited and contacted their children and made extraordinary efforts to resolve the problems that had led to the continuation of the children's dependency proceedings, they did not meet their burden to show that they had the capacity and ability to complete the objectives of their treatment plans

23

and provide for the children's safety, protection, physical well-being and special needs. (§ 366.21, subd. (g)(1).)

The record shows that Michelle and Tracy were gentle, loving and affectionate with their children. Through instruction, repetition, correction and assistance, Michelle and Tracy learned basic parenting tasks and took them to heart. However, the record shows that Michelle and Tracy continued to have difficulty assessing and responding to new or emergency situations. Their parenting skills were not ingrained or instinctive. Despite having had more than two years of in-home parenting services and other classes, their lack of attention or judgment placed the children at risk on more than a few occasions. In T.J.'s case, because of his severe asthma, an improper assessment or delay in obtaining treatment could be a matter of life and death. The social worker, Ostlund and the CASA agreed that Michelle and Tracy could not provide for the children's safety, protection, physical well-being and special needs without exceptional assistance from the maternal grandmother or SDRC, or both.

The record supports the finding that Michelle and Tracy did not demonstrate the capacity and ability both to complete the objectives of their treatment plans and to provide for the children's safety, protection, well-being and special needs. (§ 366.21, subd. (g)(1).) The juvenile court thus did not abuse its discretion when it denied the parents' requests to extend reunification services to them for another six-month period.

C

*There Is Substantial Evidence to Show That Return to the Parents Would Create a Substantial Risk of Detriment to the Children's Safety and Protection*

Michelle and Tracy contend that there is no substantial evidence to support the juvenile court's finding that returning the children to their care would create a substantial risk of

24

detriment to the children's safety and protection. They argue that the Agency made only a cursory assessment of the grandmother's ability to ensure the children's safety in the home, and that the evidence shows that the grandmother was engaged in helping the parents care for the children. Michelle and Tracy further contend that the juvenile court should have evaluated the level of risk separately for each child. They argue that even if there is substantial evidence to sustain the detriment finding in T.J.'s case, the evidence is insufficient to sustain a detriment finding in Nancy's case because Nancy does not have asthma and is no longer an infant.

At the 12-month review hearing, the court must return the child to the physical custody of his or her parent unless the Agency proves, by a preponderance of the evidence, that return to the parent would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child (detriment finding). (§ 366.21, subd. (f); see *In re Marilyn H.* (1993) 5 Cal.4th 295, 308; *In re Jasmon O.* (1994) 8 Cal.4th 398, 420.) At a review hearing, the focus is on the child's well-being, rather than on the initial grounds for juvenile court intervention. (*In re Joseph B*. (1996) 42 Cal.App.4th 890, 899.)

The reviewing court must affirm an order setting a section 366.26 hearing if it is supported by substantial evidence. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020.) "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . ." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874; *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) The judgment will be upheld if it is supported by substantial evidence, even though substantial

evidence to the contrary also exists and the trial court might have reached a different result if it had believed other evidence. (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 228.)

The record shows that Michelle and Tracy were able to care for the children in a highly structured setting with guidance and redirection. Tracy suffers from various cognitive deficits that adversely affect his memory, reasoning, understanding, judgment, insight, planning and decision making and the ability to have adequate foresight into potential consequences. While Michelle's abilities are not as limited as Tracy's abilities, her lack of physical mobility makes it difficult for her to respond to the children's basic needs and protect them in the event of an emergency. The record shows that the parents left Nancy unattended on a bed, a chair and an examining room table. When Michelle became aware that Nancy was at risk of falling from the bed and chair, she was unable to protect her. The parents were unable to prevent T.J. from running away from them on several occasions. On one occasion, they did not appear to realize that T.J. was no longer in their care.

Dr. Coullahan said that Michelle and Tracy did not appear to pay attention to the health care information that was provided during the children's medical appointments. They were unable to repeat the children's medical plan after Dr. Coullahan gave it to them. Ostlund agreed that the medical appointments were not satisfactory. Without rapid intervention in a medical emergency, T.J.'s asthma was potentially life threatening. Dr. Coullahan questioned the parents' ability to identify medical conditions that would pose a risk to T.J.'s and Nancy's health and safety, such as irregular breathing or fever.

The parents contend that the presence of the maternal grandmother in their home negates any risk to the children that they might otherwise face if returned home. Under section

26

366.21, subdivision (f), the issue is whether the children would be safe in the care of the parents, who would have custody and control of the children. The Agency was not assessing the maternal grandmother for a guardianship role. The record lacks any guarantee that the current living arrangement would be permanent. Ostlund testified that it would "[not] be healthy for anybody involved" to leave the children in the sole care of their parents. When asked whether the parents would ever be able to safely care for the children, Ostlund testified that the parents had the "skill capacity" for parenting, but said that she could not offer an opinion until the parents had more visitation, including overnight visitation, with the children. Ostlund believed that the parents still needed training to learn the children's daily routines.

Finally, we are not persuaded by the parents' argument that Nancy would not be at substantial risk of detriment if she were returned to their care. The parents left Nancy without proper supervision on three occasions—on an examination table, a bed and a chair—placing her at risk of injury. Dr. Coullahan's concerns about the parents' ability to identify medical conditions were not limited to T.J. She was as equally concerned about Nancy's medical care.

The parents are to be commended for their efforts to learn to care for their children. However, despite these efforts, there is substantial evidence to support the juvenile court's finding that returning the children to the parents' care would create a substantial risk of detriment to T.J. and Nancy. (§ 366.21, subd. (f).) Accordingly, we deny the parents' requests for relief.

DISPOSITION

The petitions are denied.  The requests for stay are denied.


AARON, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.