Filed 9/15/14  In re H.R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re H.R., a Person Coming Under the Juvenile Court Law. | D065355 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1111) |
| v. | |
| G.R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Andrea R. St. Julian, under appointment by the Court of Appeal for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

G.R. (mother) appeals an order denying her request for placement of her son, H.R., in her custody as well as her request for increased visitation.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.  The Importance of the Summary of Facts

We begin our discussion of the factual and procedural history of this matter in an unorthodox manner by discussing the applicable standard of review.  Here, the mother raises a substantial evidence challenge to the juvenile court's order.  In reviewing such a challenge, we evaluate the evidence in the light most favorable to the trial court's determinations, resolve all evidentiary conflicts in favor of the prevailing party, and indulge in all reasonable inferences to uphold the trial court's findings.  (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 (*Bickel*).)  We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.)  The burden is on the party challenging the findings and orders of the trial court to show there is no evidence of a substantial nature to support the finding or order.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Application of the "substantial evidence" test to the mother's case requires us to review the whole record in a light most favorable to the juvenile court's judgment and presume the existence of every fact the trier of fact could have reasonably deduced from the evidence in support of its decision.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  Our focus is on the whole record of evidence presented before the juvenile court and not just on " 'isolated bits of evidence.' "  (*People v. Johnson* (1980) 26 Cal.3d 557, 577.)  We discuss the well-established substantial evidence review standard in such detail here to

2

remind the parties of their obligation to this court when summarizing the facts. In reading both the opening brief and the respondent's brief, we are left with the impression that the parties are discussing two different cases. We are disappointed with the mother's opening brief in that it focuses on only the evidence that supports the mother's desired conclusion: the juvenile court should have given the mother custody of H.R. However, the court did not so order, and the mother is required to provide the facts on which the court made its determination and then explain why those facts do not support the court's conclusion. Here, she has not done so. Instead, she focuses primarily on the facts supporting her position only. This is neither helpful to this court nor appropriate under the substantial evidence review standard. (See *Bickel*, *supra*, 16 Cal.4th at p. 1053.) The mother's counsel appears to ignore that we must uphold the juvenile court's factual findings if there is any substantial evidence, whether controverted or not, that supports the court's conclusion. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) As such, for purposes of our review here, it is unimportant if evidence supporting the challenged orders is controverted. Thus, the mother should have presented the facts supporting the court's orders and then explained why that evidence is not sufficient. She did not do so.

B. H.R.'s Challenges and the Mother's Efforts to Care for H.R.

H.R. was born in 1997. Unfortunately, he has faced numerous and difficult developmental challenges since birth. He has been diagnosed with depression, anxiety, autism, and attention deficit hyperactivity disorder (ADHD).

H.R. initially lived in a home with both parents, and then later, with only his father after his parents divorced in 2000. During this time, the mother struggled to care for H.R.

3

For example, in 2002, the mother left H.R. unattended in the family home while the mother went to the store. Also, in 2003, H.R. was hospitalized for overdosing on clonidine while under the mother's supervision.

Such incidents along with H.R.'s severe behavioral problems, prompted the San Diego County Health and Human Services Agency (Agency) to open and monitor a voluntary case, wherein the father maintained primary custody, while the mother was provided with supervised visitation. Additionally, as a result of H.R.'s autism and mild intellectual and development disabilities, H.R. became a client of the San Diego Regional Center (Regional Center) in May 2003 and has continued as a patient since that time. This first voluntary case closed in October 2004 when H.R.'s behavior appeared to stabilize under the father's care.

In October 2009, the Agency opened a second voluntary case when H.R. was held at Rady Children's Hospital after experiencing a "psychotic break." The plan included more involved services and goals for the mother than what were provided for in the family's first voluntary case. For example, this case plan required the mother to undergo a psychiatric evaluation, in which the mother was later diagnosed with personality disorder, posttraumatic stress disorder (PTSD), and generalized anxiety. The psychiatric evaluation also recommended that the mother receive medication management; however, the mother disagreed with this recommendation. The case plan additionally required the mother to become involved in parent support groups for children with autism and to participate in Regional Center in-home behavior modification services in addition to maintaining daily routines to provide structure for H.R. The mother failed to comply

4

with these requirements. As a result, H.R. missed school, experienced crisis escalations, and did not receive adequate medication management under the mother's supervision. By January 2011, the mother had not made progress in complying with the case plan; however, the father had adequately participated in the case plan and had demonstrated an ability to meet H.R.'s needs. Therefore, the voluntary case was closed and H.R. remained in the father's primary custody.

On March 15, 2011, the father voluntarily placed H.R. in a group home due to H.R.'s increasingly negative behavior. The father was overwhelmed with H.R.'s behavior and had difficulties dealing with H.R.'s diagnosis and emotional instability. At the time of this placement, H.R.'s behaviors consisted of leaving the residence without permission, self-injurious behavior (e.g., hitting himself, picking or scratching at his skin, and pulling on his ears), uncooperative behavior (e.g., refusal to participate in essential routines), disruptive behavior (e.g., tantrums, screaming, yelling, and pacing), and property destruction. After placing H.R. in the group home, the father stopped participating in services and ceased providing any financial and emotional support for him.

H.R.'s first group home placement was in a service level 4 community care facility[1] that was highly structured and staffed with professionals trained in behavioral

---

[1] A community care facility is licensed by the Community Care Licensing Division of the State Department of Social Services (Licensing) to provide 24-hour nonmedical residential care to children and adults with developmental disabilities. A service level 4 facility provides care, supervision, and professionally supervised training for persons with deficits in self-help skills, and/or severe impairment in physical coordination and mobility, and/or severely disruptive or self-injurious behavior. (See http://www.dds.ca.gov/LivingArrang/CCF.cfm as of Sept. 9, 2014.)

strategies for special needs clients. After entering the group home, the frequency H.R. exhibited his concerning behaviors decreased almost immediately.

At the beginning of H.R.'s placement in the first group home, the mother was allowed supervised visits in the home. However, the visits gradually became disruptive as the mother arrived up to half an hour late to some of the visits, interfered with the group home kitchen when cooking for H.R., created safety concerns in the home by leaving an unattended stove burner on in addition to leaving the home's front door open, argued with staff about the level of care provided to H.R., took pictures of confidential items and settings in the home, and called Licensing about the home instead of first addressing her concerns with the home's staff. Each of the mother's medical concerns regarding H.R. were evaluated and deemed unfounded.

In August 2011, the mother's visits were changed to unsupervised pursuant to a family court order. The unsupervised visits presented a new set of concerns. The mother would show up for visits unannounced. She would drop off H.R. between 10:00 and 11:00 p.m. after every visit, disregarding the terms of the court order, which required H.R. to be returned by 7:00 p.m. on weeknights. When dropping off H.R. at night, the mother also would go into the home and turn on all of the lights, sometimes waking other children in the home. During the visits, the mother caused H.R. to miss taking medications, which in turn made it difficult for H.R. to calm down. He would not be able to fall asleep until 2:00 a.m. and then would struggle the following day.

Additionally, the mother continued to harass the staff at the group home and be disruptive, even after being instructed to refrain from such communication and instead

contact her attorney with concerns. For example, during this period, the mother came into the group home and accused the staff of losing H.R.'s clothes. In December 2011, after the mother was no longer allowed inside the group home, she called the sheriff's department and was observed talking to a deputy sheriff outside the home, but the deputy never came to the door or contacted staff at the group home.

H.R. observed the mother's contact with law enforcement, in addition to several of the other disruptive incidents the mother instigated in the group home. By the end of 2011, H.R. was no longer improving. He was hospitalized because his anxiety was unmanageable. In January 2012, H.R. was again hospitalized due to an increase in obsessive-compulsive disorder and self-injurious behaviors. After his discharge, H.R. was diagnosed with depression, anxiety, autistic disorder, and ADHD.

On March 26, 2012, H.R.'s first group home gave notice that it could no longer care for H.R. The home noted that a primary reason for giving notice stemmed from the mother's continued harassment of the home's staff as well as the mother's alleged assault of one of the staff when returning H.R. to the home after a recent visit. The latter incident prompted the sheriff's department to come to the group home to ensure that the mother left the property. Also, when the mother would take H.R. for unsupervised visits to her home, she would call the staff at his group home, and ask them to come get H.R. because he was hitting her and she could not handle him. Prior to H.R.'s departure, the group home indicated its notice was not caused by H.R. as he was "an awesome kid," with "unlimited potential" in a structured environment; rather, the notice was caused by the level of difficulty in working with H.R.'s parents.

7

On May 25, 2012, H.R. was placed in a second group home and adjusted well to his new surroundings. After only a few weeks at this placement, the mother began to make similar complaints about the home. In time, the group home gave notice on several occasions for similar reasons to those of H.R.'s first placement, which included: (1) the mother dropping off H.R. late after visits despite the terms of the court's visitation order; (2) H.R. missing medications while under the mother's supervision (which continued to detrimentally affect H.R.'s ability to sleep and maintain a structured routine); and (3) the Agency and Licensing visiting the group home because of the mother's complaints. On November 14, 2012, H.R.'s second group home gave final notice to terminate H.R.'s placement. Again, the home communicated that notice was not given due to H.R.'s behavior, but instead, as a result of the father's unavailability and the mother's behavior and unfounded allegations.

In September 2012, the Regional Center produced a report on H.R.'s progress and behaviors within the group homes. It reported that H.R. had limited safety awareness. For example, he did not safely cross the street and could not call 911. He required supervision while in the community to make sure he was safe.

While H.R. was still placed in his second group home, social worker Azucena Cisneros interviewed H.R.'s teacher, who had worked with H.R. on a daily basis throughout H.R.'s group home placements. The teacher explained H.R. required a great deal of consistency and structure to make meaningful progress; however, the teacher indicated that although H.R. had made some progress in the past months, his behavior fluctuated tremendously each day, making it difficult for him to meaningfully advance

academically and socially.  In a follow-up letter written by the same teacher, she explained that H.R. "is very aware of social happenings around him and is influenced by the conversations, actions, and interactions of others."  The teacher also noted that unnecessary changes in H.R.'s home or school would result in major setbacks for H.R. because he requires a long time to adjust to new situations.

During that same timeframe, Cisneros also interviewed the mother at her apartment.  Cisneros indicated that the mother had racing thoughts, made incomplete statements, and was difficult to follow throughout the conversation because she jumped from one subject to another.  At one point, the mother made incomplete statements about her own mental health progress and provided a pharmacy's refill phone number when asked for her doctor's contact information.

The mother's doctor indicated that he believed the mother was neglecting her own mental health treatment because she was focusing too much on her son's care.  The mother also had difficulty understanding her medication recommendations and often took the wrong dosage.

Based on the mother's diagnosis of depression and anxiety, her inconsistent parenting, and her inability to adequately supervise H.R., the Agency recommended further intervention services to assist the mother in caring for H.R. on her own.

On December 18, 2012, the Agency filed a petition pursuant to Welfare and Institutions Code[2] section 300, subdivision (c) on behalf of then 15-year-old H.R. alleging that since approximately January 2012, H.R. had an emotional disorder including depression, autistic disorder and ADHD, requiring mental health treatment, which his parents had both failed and were unable to provide. Further, the petition alleged that the father had stopped participating in the family's voluntary case plan, Han's caregiver had given notice to terminate placement, and the mother was not given custody by the family court.

On December 19 to 20, 2012, the juvenile court held a detention hearing and found that a prima facie showing had been made that H.R. was a child described under section 300, subdivision (c), and that out-of-home detention was necessary to protect H.R. from substantial danger. H.R. was detained in a licensed group home, and the mother was given liberal supervised visits at least twice a week, with the Agency's discretion to make the visits unsupervised.

Shortly after the detention hearing, social worker Monica Bonilla interacted with the mother a number of times. During the first interview with the mother, the mother indicated she did not understand why her son was not under her care and became defensive. Later in the interview, when the mother was asked about taking her own medications, she indicated that she was being seen for depression and anxiety, but was

_____

2      Statutory references are to the Welfare and Institutions Code unless otherwise specified.

10

not able to articulate the need for her medications and stated that her psychiatrist never told her the exact purpose of each medication.

In December 2012, the mother agreed to comply with an updated case plan, which included objectives such as: (1) notifying the social worker in the event the mother had concerns related to H.R.'s medical condition or placement; (2) attend services; (3) maintain appropriate boundaries with H.R.'s substitute care providers; and (4) comply with medical or psychological treatment provided to the mother.

A jurisdiction/disposition report dated January 9, 2013 stated that because H.R. had extensive mental health issues, and the mother also needed to address her own mental health issues, the mother, at the time, was not able to provide a safe, stable and structured environment that H.R. needed to thrive. The report also indicated that the mother's housing was stable, she could drive, and she had her own car, which allowed her to get a job. The mother had a support network of friends and family as well as a strong bond with H.R. However, the social worker observed that even though the mother wanted the best for her son, cared for him tremendously, and had attended a Spanish autism parent support group, she still needed assistance in advocating appropriately for his needs and providing the structure and consistency required to keep H.R. safe.

On January 16, 2013, H.R. was moved to his third placement in a level 4 respite home. At the beginning of this placement, the mother had supervised visitation and then moved to unsupervised visitation shortly thereafter. Although the visits appeared to go well, H.R.'s concerning behaviors did not improve. In January and again in early March

of 2013, H.R.'s teacher echoed concerns when she reported that H.R.'s negative behaviors were only increasing in the classroom.

At the settlement conference on February 4, 2013, the mother submitted to the section 300, subdivision (c) petition, and the juvenile court made a true finding. The juvenile court continued to detain H.R. at his current respite home and ordered supervised and liberal visitation with the mother. The juvenile court gave discretion to the Agency to allow overnight visits and/or to place H.R. with the mother, with concurrence of H.R.'s counsel. The contested disposition hearing was continued.

On March 11, 2013, the juvenile court held a special hearing on H.R.'s educational rights. H.R. had been demonstrating behavioral outbursts that required more classroom support and modification. At that point, the mother was progressing in that she demonstrated knowledge of H.R.'s needs, maintained appropriate boundaries with H.R.'s placement, and met time expectations for visits. The mother's therapist stated that she was in a better emotional state and was compliant with her medications. The juvenile court allowed the mother to retain educational rights for H.R. and found she was able to make educational decisions on his behalf.

That same month, H.R. began yelling, slamming doors, and running up and down stairs after being returned to his respite home, following an unsupervised visit with the mother. He then became physically aggressive towards his foster mother and pushed her son to the floor. Consequently, H.R. was taken to the hospital where he was physically restrained and sedated. The mother began making claims that the foster family at the

12

respite home abused H.R. H.R. was released from the hospital the next day and placed in a new respite home, his fourth placement.

Two weeks later, the police were called and H.R. was again hospitalized overnight due to H.R.'s screaming, punching holes in walls, destroying doors, and throwing objects after a visit with the mother. Following another unsupervised visit with the mother, after which she returned H.R. an hour and 15 minutes late, the police were once again called and H.R. was hospitalized.

Throughout the mother's unsupervised visitation, the respite home reported that there had been incidents where the mother was overheard telling H.R. that he would be coming home to her soon. In April 2013, H.R.'s fourth placement gave notice that they could no longer care for H.R. due to his severe and unstable behavior. During this same time, H.R. also was showing difficult behavior at school, refusing to go into the classroom, and in one instance, defecating in the bushes. The mother was part of the decision to move H.R. to Stein Education Center.

On April 16, 2013, Bonilla met with Dr. Joseph Schmidt (a psychologist who has known H.R. since he was a young child), Danielle Hazlehurst (H.R.'s case worker at the Regional Center), Mary Kay (court appointed special advocate, or CASA), and Ruben Vega (group home social worker). The team was concerned with the intensity and escalation of H.R.'s negative behaviors, especially since they had been surfacing after the unsupervised contact with the mother. They concluded that H.R. would benefit from a more structured environment with increased supervision.

13

After the meeting, Schmidt provided a letter addressing H.R.'s behavior and special needs. Schmidt explained that because H.R. is severely autistic, he has "an exceptional level of anxiety[,] which often becomes debilitating in response to uncertainty and change." Schmidt also opined that the multiple placements, coupled with the increased visits with the mother in facilitating possible reunification, "amplified the behavioral intensity of an already highly disabled individual." Schmidt stated that placing H.R. in another level 4 group home would be the best option for H.R.

Additionally, in addressing H.R.'s placement with the mother, Schmidt voiced concern. Specifically, he indicated it is often difficult for a single parent to meet the exceptional needs of a child like H.R. because the parent is often reluctant to enforce limits "out of fear that the child will escalate uncontrollably." In turn, the parent only reinforces the child's extreme behaviors and interferes with the child's development and need for routine. Further, Schmidt explained that because H.R. has a history of not sleeping through the night, the mother would need to be awake all night to provide proper care, which would be difficult to maintain on a routine basis. Finally, Schmidt questioned the mother's judgment regarding her son's needs, given the number of unsubstantiated claims of abuse made about her son, which interfered with his placements and regularly interrupted his need for consistency and structure.

After the settlement conference on April 24, 2013, H.R. went to his mother's home for an extended 13-day unsupervised visit per the juvenile court's approval. As conditions to the visit, the mother was directed to: (1) participate in wraparound services, (2) take H.R. to school on time, and (3) cooperate with the assigned social worker.

14

The next day, while H.R. was in the mother's care, H.R.'s new school reported that the mother showed up an hour late to school and that H.R. refused to get out of the car. The school also indicated H.R. was verbally abusive and threatened both the mother and staff with violence. School staff reported that the mother did not seem to grasp H.R.'s disability. The mother acknowledged that she was late in taking H.R. to school because H.R. had made a mess in the bathroom when they needed to leave. She claimed this was the first time H.R. acted in this manner under her supervision.

On April 26, 2013, the mother was again unable to make H.R. get out of her car once at school. Later this same day, Bonilla visited the mother's home and observed H.R. get in the mother's face when talking to her, pace back and forth through the apartment, and go to his room and shut the door. During the visit, the mother commented that she still thought that H.R. was on too much medication, and it was not addressing his behaviors. The mother also stated her son had been returned to her "como mierda" (like shit), she was the only one who understood her son, and she needed to be left alone by all service providers.

On April 29, 2013, the mother again attempted to take H.R. to school, but H.R. refused to get out of her car. The school reported H.R. became verbally abusive and physically assaultive towards the mother once in front of the school. At one point, H.R. broke the rearview mirror in the mother's car.

On April 30, 2013, the mother did not take H.R. to school because he refused to leave her home. The mother indicated she wanted to wait for H.R. to go to school until a school bus could transport him. Although Bonilla explained the mother would need to

15

continue to take H.R. to school because it would take at least two weeks to secure bus transportation, the mother did not attempt to take H.R. to school for the remainder of the 13-day visit. The mother also refused to participate in wraparound services, despite a scheduled meeting with a care coordinator that same day.

A few days later, Bonilla made another unannounced visit to the mother's apartment. During the visit, H.R. constantly yelled in Spanish, "[D]on't tell me to relax." H.R. also slammed doors, grabbed and shook the mother, and put his hand towards the mother's face and tried to slap her. The mother reported she felt overwhelmed in meeting H.R.'s needs and her hands hurt from constantly rubbing H.R.'s back. When the social worker explained that a new group home was interested in interviewing H.R. for placement, the mother indicated this was "ok" and agreed to answer her phone to discuss placement. Later that night (at 1:00 a.m.), Bonilla received a text message from the mother indicating she wanted to wean H.R. off his medication because he continued to be anxious and her head hurt from having to repeat everything to him.

At the May 6, 2013 hearing, the juvenile court terminated H.R.'s visit with the mother and ordered the mother to produce H.R. to the social worker due to the number of concerns arising out of the extended visit. H.R. was then detained in Polinsky Children's Center, which was his fifth placement.

On May 21, 2013, the juvenile court declared H.R. a dependent, and removed him from the custody of the father and found that placement with the mother would be detrimental because, although she was aware of all of H.R.'s mental disabilities, she had a history of "interfering" with or "sabotaging" efforts to keep him on appropriate

16

medication management, keep him engaged in school, and to live peacefully and without incident in various homes. The juvenile court set review hearings in due course. The juvenile court also limited the mother's educational rights and ordered that H.R.'s CASA hold education rights due to the mother's unwillingness to acknowledge H.R.'s need for specialized services; however, the juvenile court ordered the mother be included in any educational meetings for the child and to be updated on H.R.'s progress. The juvenile court ordered the Agency to arrange supervised visitation with the mother outside the confidential group home.

Following the contested disposition hearing in May 2013 were several 15-day review hearings regarding H.R.'s placement. H.R. was still detained at Polinsky Children's Center and the Agency was working with the Regional Center to find an appropriate level 4 home that could meet H.R.'s needs. Placement with a "deflection" group home was identified and efforts began to prepare H.R. for the transition.[3] There were also two requests to modify H.R.'s medication because he was observed responding to internal stimuli, exhibiting self-harm behaviors, increased aggression towards staff, property damage, and not sleeping through the night. H.R. was hospitalized at Children's Adolescent Psychiatric Services (CAPS) on June 26, 2013 due to self-harm, trying to attack staff, and breaking a television. This episode required four-point restraints on H.R.'s body. By July 15, 2013, H.R.'s behavior had improved at CAPS. He was

---

[3] A "deflection" group home is one that can provide a one-to-one ratio between the residents and staff and where each resident has his or her own room. These homes have a higher level of support when dealing with a resident's behaviors as well as his or her disabilities.

complying with general hygiene and eating. However, despite these gains, H.R. would not leave his room and was still bothered by stimulation. On July 15, 2013, H.R. was moved into the deflection group home called Home for Guiding Hands. That same month, H.R. was observed and treated by Dr. Gregory Carinci, a clinical psychologist and behavior analyst. Carinci developed a 14-page personal behavior intervention plan for H.R. This plan specifically outlined the types of proactive and reactive measures that caregivers and staff could use in anticipation and response to H.R.'s sometimes aggressive and self-destructive behaviors. Carinci's suggestions to caregivers included: have a predictable, consistent schedule with plenty of alternate activity choices for H.R.; allow H.R. to express himself appropriately; never raise a voice at H.R.; give H.R. ample time to process directions; constantly reinforce good behavior; give H.R. positive attention at least every 30 minutes throughout the day; and pace his activities by giving him breaks, then redirecting him to the task. Most importantly, Carinci advised that H.R. required a high degree of supervision and monitoring concerning his whereabouts, and he should rarely, if ever, be out of sight of a caregiver. Carinci concluded his intervention plan with an overall summary for H.R. and his caregivers:

"[H.R.] is a complex child with multiple needs. Mitigating factors compound his situation and interact to produce challenging, often volatile behaviors. One particular aspect that is of critical importance is that of consistent responding across individuals involved with [H.R.'s] care. It is necessary for all participants and caregivers to understand and comply with a daily regiment . . . . All will need to follow through with reinforcement schedules . . . . When this is done in an inconsistent manner, as has been

18

done in the past, [H.R.'s] presentation will be increasingly erratic and compulsive, rendering therapeutic . . . interventions ineffective . . . . A highly structured, organized environment is significant to [H.R.'s] adaptation and development. Communication between the home and school environment is essential . . . . "

The Agency's November 18, 2013 report for the six-month review hearing reported H.R. still had some aggressiveness, trouble getting to and from school, and still some instances of pulling at his ears and hitting himself on the head. The mother had moved into a two-bedroom apartment, she was taking a ballet class to relax, she had quit smoking, her overall health improved, and she was still being seen by the St. Vincent de Paul medical clinic. However, the mother's psychiatrist at St. Vincent de Paul reported the mother remained "quite symptomatic," confirming a diagnosis of major depressive disorder and PTSD, and recommending an increase in her medication.

According to the mother's therapist, the mother was progressing in dealing with her own mental health issues and how they affected her parenting. The mother also was learning techniques on how to handle H.R.'s needs and practicing these techniques during visitations. Her remaining obstacles included her unrealistic expectations for her treatment, her mistrust of the system, her fears H.R. was being neglected or abused, and her tendency to externalize blame. The mother continued to raise concerns about H.R.'s group home placement and the fact that she still did not believe anything was wrong with her. The mother expressed she felt she was being left out of decisionmaking for her son, the Agency was acting like H.R.'s mother, and compared the Agency to the "mafia," fearing for her son's safety.

19

Weekly supervised visits began between H.R. and the mother since his placement at the new group home in July 2013. The visits were positive overall as the mother was affectionate, asked H.R. questions, groomed him, read to him, and massaged him. However, H.R. still displayed some yelling, obsessive-compulsive behaviors, and difficulty with transitions. H.R. would be much more agitated after visits. Because H.R. was having some trouble adjusting to his new group home, and the Agency was still observing the mother for the desired behavioral goals in her case plan, the social worker opined that it was not appropriate to place H.R. with the mother at that time. The social worker stated specifically that, H.R.'s "behaviors are not stable and it would put [the mother] in physical danger if she were to care for her son due to his increased aggressiveness and property destruction." It was also concerning to the social worker that the mother was not taking responsibility or acknowledging how her behavior impacted H.R.'s stability.

Therefore, the Agency's recommendations at the six-month review hearing were for H.R. to remain in the group home and for the mother to continue reunification services. The mother set the six-month review hearing for trial on the issues of seeking placement with her while she received respite care and also for increased visits.

A pretrial status conference was held on December 18, 2013. The Agency's addendum report filed for this hearing gave a summary of the previous month. H.R.'s special education teacher at his school indicated H.R. had multiple concerning behaviors throughout the day; however, there was an increase in this behavior on Mondays, which was the day after visits with the mother. Additionally, he came late to school on

20

Mondays and had trouble with transitions. H.R.'s teacher also reported that H.R. was acquiring a general sense of boundaries and expectations at school.

During this time, H.R. was adapting well at the group home and was observed as being more calm and complacent. While H.R.'s behavior was far from acceptable, it was controlled in a manner so that restraints were not necessary. H.R. appeared to respond positively when he could anticipate upcoming events, but he still required monitoring 24 hours a day. H.R. also exhibited an increase of self-inflicting injury before and after visits with the mother, including hitting and scratching himself (especially his eyes). The day after visits with the mother, H.R. wet the bed and had a hard time getting up to go to school.

The group home supervisor advised that H.R. needed to be more stabilized on his medications before visits with the mother were expanded. She also believed that the visits should be an hour and a half because two hours was too long for H.R. The house supervisor said H.R. tended to be depressed after visits with the mother, going to sleep for hours instead of eating. He even threw a plate of food on the ground, which the supervisor said she had never seen him do before. He also would destroy property and slam doors after visits, and five times he was heard saying, " 'I hate you mom.' "

Because these visits with the mother seemed to cause an increase in anxiety, self-inflicting injury, and depression, the Agency continued to not recommend expanding visits with the mother or placing him in her care. In an addendum report prepared for the January 15, 2014 contested six-month review hearing, the Agency explained it did not expand the mother's therapy sessions to twice a week because she had already been

21

seeing her therapist for seven years without any progress. The Agency suggested changing therapists instead of increasing sessions with the current therapist. The Agency questioned the therapist's therapeutic approach and wanted to see the mother focus more on her anxiety about H.R.'s placements and learn to better cope with other service providers, which meant a relinquishment of power to those who were helping the family. The Agency also suggested that it was time the mother got some modeling of the interventions Carinci had created for H.R.

In addition, Carinci provided a letter dated January, 2014[4] stating that H.R. is a danger to himself and others and therefore must be consistently supervised and monitored at all times. H.R. required excessive prompting on almost all of his tasks, requiring an intensely structured environment. Carinci wrote, "It is difficult to imagine [H.R.] living without the structure and supervision that a group home can provide . . . ." He continued: "Although it is a primary goal . . . to reunify [H.R.] with his family unit, [H.R.'s] behaviors are currently highly unstable and fluctuating. A regression in skills and behaviors could be anticipated with this type of transition." Also, Carinci opined that for H.R. to be considered for a lower level of care, including a return to the mother's custody, his self-injurious behavior needed to significantly reduce, and his management of his emotions improve.

As before, the Agency continued to make the same recommendations that H.R. not be placed with the mother and remain in the level 4 group home. The Agency asserted

---

4    The letter did not include a specific day. It merely was dated "January, 2014."

the mother did not have the tools necessary to handle H.R.'s behaviors and did not understand the reality of H.R.'s disabilities. For example, the mother did not think medication for H.R. was beneficial, and she was certain that H.R. could ride the bus without being strapped in, even after educational professionals advised otherwise.

## B. The Contested Six-Month Review Hearing

On January 15, 2014, the mother and Bonilla were present for the six-month review hearing. The juvenile court admitted into evidence the six-month review status report dated November 18, 2013; an addendum report dated December 18, 2013; an addendum report dated January 14, 2014; Bonilla's curriculum vitae; and a CASA report dated November 18, 2013. Bonilla also was made available for cross-examination.

The Agency stipulated to a no reasonable services finding based on the mother's agreement to change her therapist. Further, the Agency agreed to contact H.R.'s behavioral specialist to set up an assessment to evaluate whether the mother was ready to participate in H.R.'s therapy. The issue of placement with the mother was litigated.

### 1. Bonilla's Testimony

Bonilla stated that the mother was patient with H.R. and she would groom him. H.R. would get irritable or act erratically with the mother, but this behavior was also seen with group home staff and people other than the mother. Bonilla observed the mother to be able to soothe or calm H.R. in the past. H.R. would respond to the mother and tell her that he loved her, but he did not initiate telling her. Bonilla expedited the referral for the wraparound services assessment before H.R. began his visit with the mother, but the mother cancelled her appointment. Bonilla explained that the referral for the wraparound

23

services is usually done three months prior to return of the child with the parent; however, in this case, the mother was only getting supervised visits at that time. Therefore, the referral for the in-home wraparound services was expedited the week before H.R. was going to stay with the mother for the 13-day trial visit. The mother later told Bonilla that she did not refuse the services, rather she was denied services. Bonilla spoke about the anxiety the mother had about H.R.'s placements, and how H.R. himself had stated that a man named Javier had punched him in the stomach. Bonilla found this allegation to be unfounded after further investigation.

Bonilla stated that none of the service providers for H.R. have told her that H.R. was ready to be released to the mother. She explained that H.R.'s current home provided a one-on-one care to address H.R.'s autism and obsessive-compulsive disorder. When asked about the mother's request for increased visits, Bonilla said H.R. continued to have behavioral problems after visits with the mother, as evidenced by H.R.'s increased acts of property destruction, self-inflicting harmful behavior, and not eating. H.R. also was negatively affected by changes in his schedule. As such, Bonilla opposed an increase in visitation.

## 2. The Juvenile Court's Orders

After considering the evidence and hearing argument by counsel, the juvenile court found by clear and convincing evidence that the return of H.R. to the custody of the mother would create a substantial risk of detriment to H.R.'s physical and emotional well-being. The juvenile court found that there was no doubt that the mother loves and cares for her son deeply, but the focus was on H.R.'s well-being. The court

24

acknowledged that just one visit with his mother seemed to be causing H.R. to act out and become agitated. This provided an indicator to the court that even in a very controlled setting, increased visits or return to the mother would cause H.R. further detriment. The court also continued the Agency's discretion to expand visits, but it did not order more visits as the mother requested. However, the juvenile court did order the Agency to inquire with H.R.'s service providers to see what they could do to get to the point of expanded visitation.

DISCUSSION

I

*SUBSTANTIAL EVIDENCE SUPPORTS THE COURT'S*<br>*ORDER DENYING THE MOTHER CUSTODY OF H.R.*

The mother first argues that substantial evidence does not support the court's order denying her custody of H.R. We disagree. On the record before us, we conclude substantial evidence overwhelmingly supports the juvenile court's order that return of H.R. to the mother's custody would create a substantial risk of detriment to H.R.'s physical and emotional well-being. In reaching this conclusion, the court considered, among other evidence, the letters from Carinci, the six-month review status report dated November 18, 2013; an addendum report dated December 18, 2013; an addendum report dated January 14, 2014; and a CASA report dated November 18, 2013.[5]

---

5    These reports provide the factual basis for much of the subsection entitled "H.R.'s Challenges and the Mother's Efforts to Care for H.R."

25

Carinci's letters detailed the challenges H.R. faces, which cause him to be a danger to himself and others. Because of this, Carinci concluded H.R. must be consistently supervised and monitored at all times. Carinci also noted that H.R. requires excessive prompting on almost all of his tasks, necessitating that H.R. be placed in an intensely structured environment. In addition, Carinci opined that for H.R. to be considered for a lower level of care, including a return to the mother's home, his self-injurious behavior needed to significantly reduce, along with an increase in managing his emotions.

The various reports considered by the juvenile court detailed the struggles the mother had in caring for H.R. Moreover, they made clear that H.R. struggled to adjust to his facility when he returned from visits with the mother. These reports all support the court's order here:

> "At this time it would not be appropriate to place [H.R.] with his mother as his behaviors are not stable and it would put [the mother] in physical danger if she were to care for her son due to his increased aggressiveness and property destruction."

> "The Agency is not in agreement with expanding supervised visits for [the mother] or placing [H.R.] under her care at this time."

> "I have watched [H.R.'s] mental health deteriorate since I have come on the case in January 2013. I feel a great deal of this is due to the instability in placements and the fact that [the mother] does not fully understand [H.R.'s] disability."

> "I am concerned that [H.R.'s] behavior will become more erratic if visits with [the mother] were to be unsupervised or extended for longer periods of time. . . . [¶] [The mother] loves her son and wants to care for him; however, I do not believe at this time that is possible."

> "[The mother] has a history of neglect towards [H.R.]-she has left him alone and he overdosed on his medication while under her care-

26

> and a longer history of making CPS allegations against all of [H.R.'s] care providers. . . . [The mother] does not have the tools necessary to address his behaviors and there is concern by the undersigned about her understanding the reality of [H.R.'s] mental health."

In short, the reports are replete with examples explaining why the mother was not capable of providing H.R. with the type of environment and structure he needs. Bonilla's trial testimony supported this conclusion. Such evidence essentially compelled the juvenile court to find returning H.R. to the custody of his mother would be a detriment to him.

The mother's attorney, however, fails to explain why this evidence is insufficient. Instead, she largely ignores this evidence and focuses on other evidence she believes supports her client's position that H.R. should be returned to her custody. This is not proper for a substantial evidence review. (See *Bickel*, *supra*, 16 Cal.4th at p. 1053.) Also, we may not reweigh evidence or resolve evidentiary conflicts during a substantial evidence review. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 415.) In essence, this is what the mother is asking us to do.

We acknowledge the significant obstacles facing both H.R. and the mother here. H.R. confronts severe challenges simply trying to interact with others and engage in basic life skills without injuring himself or others. Although the record makes clear that the mother loves and cares for H.R. deeply, she has her own limitations that prevent her from providing H.R. with the kind of stability and 24-hour care he needs. And while we note the circumstances presented here are nothing short of tragic, on the record before us, we do not view this as a close case. There is an abundance of evidence supporting the juvenile court's order.

27

## II

*THE COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE
MOTHER'S REQUEST FOR EXPANDED VISITATION WITH H.R.*

As a threshold matter, we note that the parties disagree regarding what standard of review we apply to the mother's challenge to the order denying her increased visits with H.R. The mother argues we should employ a substantial evidence review. The Agency argues an abuse of discretion is the appropriate standard. We agree with the Agency because the court did not deny all visitation, but instead, exercised its discretion to maintain the same level of visitation. (See *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) However, under either standard we affirm the juvenile court's order.

A court defines the rights of the parents to visitation by balancing the interests of the parents in visitation with the best interests of the child. (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) During the reunification period, visitation must be as frequent as possible, "consistent with the well-being of the child." (§362.1, subd. (a)(1)(A); see *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426; *In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.) The court may limit a parent's contact with a child upon finding that such limitation is in the child's best interest. (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1133.)

Here, we note that the court did not deny the mother visitation with H.R. altogether or limit existing visitation. Instead, the juvenile court elected not to increase visitation. There was plenty of evidence before the court regarding H.R.'s need for a stable environment and 24-hour care. Further, evidence was presented that H.R. had

trouble adjusting after he returned from visits with his mother.  Against this backdrop, we are satisfied the court did not abuse its discretion in maintaining the same level of visitation.  There is nothing in the record that leads us to believe that the court's decision was arbitrary, capricious, or patently absurd.  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318.)

## DISPOSITION

The order is affirmed.


HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


McINTYRE, J.